[No. 53394-1-I. Division One. April 4, 2005.]

VERSUSLAW, INC., *Appellant*, v. STOEL RIVES, L.L.P., ET AL., *Respondents*.

---

312

*Robert B. Gould*, for appellant.

*William F. Cronin* and *Joshua J. Preece* (of *Corr Cronin Michelson Baumgardner & Preece, L.L.P.*), for respondents.

¶1 SCHINDLER, J. — VersusLaw, Inc. (VersusLaw) appeals the trial court's order granting summary judgment to Stoel Rives, L.L.P. (Stoel Rives) in this attorney malpractice action. Because we conclude there are material issues of fact, we reverse the trial court's decision to grant summary judgment, vacate the final judgment entered on November 3, 2003, and remand for further proceedings consistent with this opinion.

## FACTS

¶2 Matthew Bender and Company (Matthew Bender) was a national publisher of secondary legal research materials. VersusLaw is a Washington company that published an electronic primary research database of case law and statutes. Joseph W. Acton is the president and chief executive officer of VersusLaw. Matthew Bender was interested in obtaining a source for primary case law database access so that it could provide links from its online publications to case law. In 1997, Matthew Bender contacted VersusLaw and negotiated an agreement to obtain access to VersusLaw's electronic case law database.

¶3 Matthew Bender agreed to pay $600,000 a year in royalties and invest $7.5 million in VersusLaw in exchange for the right to provide access to VersusLaw's case law database through links in Matthew Bender's internet publications. Stoel Rives represented VersusLaw in the negotiations with Matthew Bender and drafted an agreement, which included the Series B Preferred Stock Purchase Agreement (Stock Agreement), the Loan and Repayment Agreement (Loan Agreement), and the Irrevocable License Agreement (License Agreement).

¶4 On October 21, 1997, Matthew Bender and VersusLaw executed the three agreements. In the Stock Agreement, Matthew Bender agreed to invest $3 million for VersusLaw stock. In the Loan Agreement, Matthew Bender loaned VersusLaw $4.5 million. VersusLaw promised to repay the loan by October 20, 2007, and make biannual interest-only payments at eight percent on the outstanding principal in December and June of each year. VersusLaw also executed a promissory note, security agreement, and UCC-1 Financing Statement for the loan.

¶5 The License Agreement allowed Matthew Bender to use and allow access to VersusLaw's case law database. The agreement required VersusLaw to deliver its licensed database materials to Matthew Bender no later than September 30, 1998. Upon delivery, Matthew Bender agreed to pay VersusLaw a monthly licensing fee of up to $50,000 for the first 60 months, followed by a variable royalty fee.[1] Matthew Bender could reject VersusLaw's database only if it notified VersusLaw of a substantial and material noncon-

---

[1] The minimum royalty was a monthly $25,000 royalty and a monthly $25,000 maintenance and update fee. The License Agreement provided that the minimum monthly royalty would be phased in over the first 11 months, with 1/12 of the monthly payment due in the first month, 2/12 due in the second month, and so forth, until the 12th month, when the minimum monthly royalty of $50,000 would be due. Starting in the 37th month, the royalty payment due would be either the $50,000 per month minimum royalty payment, or an alternate royalty based on sales. Starting in the 61st month, the minimum monthly royalty would no longer apply and the royalty fee would consist of the sales-dependent alternate royalty. Thus, the License Agreement provided for a minimum royalty payment of up to $50,000 per month for five years, but no guaranteed minimum thereafter. *See* Clerk's Papers (CP) at 462-63.

formity.[2] The License Agreement also contains a binding arbitration provision and an express two-year time limitation for legal claims.[3]

¶6 Matthew Bender and VersusLaw treated the three agreements as part of one transaction. VersusLaw expected to use the monthly royalty revenue to meet its obligation to pay interest on the loan. Matthew Bender planned to provide access to the VersusLaw database in early 1998 and was anxious to begin work on conversion programs to integrate VersusLaw's database into links in its online publications.

¶7 In November 1997, at Matthew Bender's request, VersusLaw delivered the case law database for three states so Matthew Bender could determine whether the data was compatible and prepare conversion programs. With this delivery, Matthew Bender was able to successfully integrate VersusLaw's data in links from Matthew Bender's publications.

¶8 In November or early December, Times Mirror Publishing, the parent company of Matthew Bender, announced it was going to concentrate on its newspaper publications and consider selling Matthew Bender.

¶9 On December 1, 1997, VersusLaw made an interest payment to Matthew Bender under the terms of the Loan Agreement. In December 1997, Acton attempted to deliver VersusLaw's case law database to Matthew Bender but Matthew Bender told Acton not to send the database.

---

[2] CP at 460.

[3] The arbitration clause provides:

[A]ny and all disputes or controversies arising under this Agreement shall be resolved by private, binding and final arbitration before a party of three arbitrators conducted in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association ("AAA"). . . .

All arbitration decisions made in accordance with this . . . shall be final and binding upon the parties.

CP at 467.

The two-year limitations provision states, "No legal action may be brought in connection with this agreement, the licensed materials, or any performance or nonperformance hereunder, more than two years after the cause of action has accrued." CP at 459 (original in all caps).

¶10 In spring of 1998, VersusLaw learned that LEXIS/NEXIS (Lexis), a competitor case law database publisher, was the likely buyer of Matthew Bender. Sometime in spring 1998, VersusLaw again attempted to deliver its case law database to Matthew Bender. The Vice President of Electronic Publishing for Matthew Bender told Acton not to send the database. She testified that Matthew Bender instructed her to tell Acton not to send any data.

¶11 Sometime after Matthew Bender refused to accept delivery of the database in spring 1998, Stoel Rives advised VersusLaw to not pay the June interest payment due under the Loan Agreement and to obtain a waiver from Matthew Bender. Matthew Bender agreed VersusLaw did not have to pay the June interest payment.

¶12 In August 1998, Matthew Bender was sold to Lexis and Lexis acquired Matthew Bender's ownership interest in VersusLaw. At some point after the acquisition, Lexis decided it was not interested in VersusLaw's database.

¶13 On July 21, 2000, Matthew Bender filed a complaint against VersusLaw and a demand for arbitration based solely on the Loan Agreement. Matthew Bender alleged it had fully performed by making the $4.5 million loan and VersusLaw was in default for failing to make interest payments. Matthew Bender claimed it was entitled to payment of the loan principal and past due and accrued interest for a total of $5.4 million. Matthew Bender also sought to enforce the security interest and foreclose on VersusLaw's assets. Matthew Bender requested an order requiring immediate repayment and foreclosure of VersusLaw's interest in its assets.

¶14 In its arbitration complaint, Matthew Bender took the position that the rights and obligations of the Loan Agreement and License Agreement were unrelated, separate transactions because there was no integration clause in the Loan Agreement and performance by Matthew Bender under the License Agreement was not a condition precedent to VersusLaw's obligation under the Loan Agreement. In the event VersusLaw tried to assert claims under

the License Agreement, Matthew Bender alleged those claims were barred by the two-year time limitation provision.[4] Matthew Bender requested a declaratory judgment order barring VersusLaw from raising Matthew Bender's unrelated breach of the License Agreement.

¶15 On August 11, 2000, Stoel Rives on behalf of VersusLaw filed a notice of breach of the License Agreement and a counterclaim. In the notice, VersusLaw claimed Matthew Bender was in breach for failing to accept delivery of the VersusLaw database and to pay royalties as required by the License Agreement.

¶16 On December 27, 2000, Stoel Rives attorney Deborah Elvins told Acton that she was going to disclose to Stoel Rives' malpractice insurance carrier, ALAS, that VersusLaw's claim for royalties may have been compromised by Stoel Rives' failure to advise VersusLaw to timely file a claim as required by the License Agreement. On January 11, 2001, Elvins wrote to Acton advising him that she was going to disclose VersusLaw's potential malpractice claim to ALAS and requesting written consent for Stoel Rives to continue representing VersusLaw.

> As we discussed, it is possible that your claim against Matthew Bender under the Irrevocable License Agreement may be barred by the contractual two year statute of limitations in the Irrevocable License Agreement, and that VersusLaw may have a claim against me for failing to advise you to commence an arbitration against Matthew Bender on a timely basis. If [sic] is a factual issue whether your claim arose more [than] two years prior to July 21, 2000, the date of Matthew Bender's demand for arbitration, but it is possible that the arbitration panel could so rule. The purpose of our conversation on August 22 and this letter is not to ask you to waive any claim that VersusLaw may have against me, but to confirm in writing the consent that you gave on August 22 to the continued representation of VersusLaw by Stoel Rives in the arbitration.
>
>     . . . .

---

[4] According to Matthew Bender's general counsel, Matthew Bender took into consideration the two-year time limitation provision in deciding when to file its demand for arbitration.

Please confirm the consent that you provided in August to Stoel Rives continuing representation of VersusLaw by signing the enclosed copy of this letter and returning it to me for the file.[5]

On January 23, Stoel Rives withdrew and Danielson, Harrigan & Tollefson appeared to represent VersusLaw in the arbitration proceedings.

¶17 In November 2001, Matthew Bender and VersusLaw agreed to settle their claims in the pending arbitration. As part of the settlement agreement, VersusLaw agreed to pay $1 million of the original loan principal immediately and to accelerate the maturity date for the loan from 2007 to 2004 with monthly rather than biannual interest payments. Matthew Bender agreed to a $1 million reduction of the principal amount due. The parties agreed to terminate the License Agreement.

¶18 In June 2002, VersusLaw sued Stoel Rives for legal malpractice. VersusLaw claimed Stoel Rives' attorneys were negligent and breached the standard of care in their representation of VersusLaw. VersusLaw alleged Stoel Rives negligently drafted the agreements with Matthew Bender and failed to advise VersusLaw to timely assert its claim for unpaid royalties under the License Agreement. VersusLaw claimed damages resulting from Stoel Rives' negligence including royalty payments, the additional costs caused by the settlement agreement with Matthew Bender, and attorney fees.

¶19 After the deposition of Elvins, VersusLaw requested production of a November 2, 2000 memorandum and a January 22, 2001 memorandum between Elvins and another Stoel Rives lawyer regarding the timeliness of filing VersusLaw's royalty claim against Matthew Bender and VersusLaw's potential malpractice claim against Stoel Rives. The trial court denied VersusLaw's motion to compel on the grounds that the communications were protected by the attorney-client privilege. After further discovery,

---

[5] CP at 14-15.

VersusLaw learned about other documents. VersusLaw filed a second motion to compel production of communications between Elvins and other attorneys at Stoel Rives.

¶20 Stoel Rives filed a motion for summary judgment arguing that as a matter of law the Stoel Rives attorneys were not negligent in their representation of VersusLaw, VersusLaw did not incur any damages, and there was no proximate cause between the acts of Stoel Rives and VersusLaw's alleged damages. The trial court granted Stoel Rives' motion for summary judgment and dismissed VersusLaw's lawsuit. Because the court dismissed VersusLaw's lawsuit, the court did not rule on VersusLaw's pending motion to compel. VersusLaw appeals.

## ANALYSIS

¶21 VersusLaw contends the trial court erred in granting summary judgment because there are genuine issues of material fact about (1) when VersusLaw's claim for unpaid royalties accrued under the License Agreement, (2) whether VersusLaw suffered damages because of Stoel Rives' negligence, and (3) whether Stoel Rives' negligence was a proximate cause of VersusLaw's damages.

¶22 This court reviews summary judgment orders de novo. *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party bears the burden of demonstrating there is no genuine dispute as to any material fact. *Green v. A.P.C.*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998). "A material fact is one upon which the outcome of the litigation depends, in whole or in part." *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980). Only when reasonable minds could reach but one conclusion on the evidence should the court grant summary judgment. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 485, 78 P.3d 1274 (2003); *Morris v.*

*McNicol*, 83 Wn.2d 491, 494-95, 519 P.2d 7 (1974). In conducting this inquiry, the court must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *City of Lakewood v. Pierce County*, 144 Wn.2d 118, 125, 30 P.3d 446 (2001). Where different, competing inferences may be drawn from the evidence, the issue must be resolved by the trier of fact. *Hudesman v. Foley*, 73 Wn.2d 880, 889, 441 P.2d 532 (1968); *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 739, 904 P.2d 793 (1995).

¶23 To establish a claim for legal malpractice, a plaintiff must prove the following four elements: (1) the existence of an attorney-client relationship, which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between the attorney's breach of the duty and the damage incurred. *Hizey v. Carpenter*, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992).

*VersusLaw's Claim for Royalties*

¶24 VersusLaw contends there are material issues of fact about when its claim for unpaid royalties accrued and the trial court erred in ruling as a matter of law that VersusLaw's royalty claims were timely filed in the Matthew Bender arbitration in August, 2000. The trial court in its order decided, "VersusLaw's claims against Matthew Bender under the License Agreement did not accrue before September 30, 1998, and those claims were asserted within the two-year limitations period set forth in the License Agreement."[6] Stoel Rives argued below and argues on appeal that VersusLaw's claims for unpaid royalties did not accrue under the terms of the License Agreement until September 30, 1998. VersusLaw contends its claims accrued when Matthew Bender repudiated the License Agreement in spring 1998.

¶25 A contract claim accrues when there is a breach of contract. *Schwindt v. Commonwealth Ins. Co.*,

---

[6] CP at 1251-52.

140 Wn.2d 348, 353, 997 P.2d 353 (2000). The question of anticipatory repudiation is one of fact and can be decided on summary judgment only "if, taking all evidence in the light most favorable to the non-moving party, reasonable minds can reach only one conclusion." *Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc.*, 85 Wn. App. 354, 365, 933 P.2d 417 (1997). " 'An intent to repudiate may be expressly asserted or circumstantially manifested by conduct.' " *Id.* (quoting *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991)). A party's intent to repudiate cannot be inferred from " 'doubtful and indefinite statements that performance may or may not take place.' " *Id.* (quoting *Wallace Real Estate Inv., Inc. v. Groves*, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994)). Repudiation by a contracting party requires "a clear and positive statement or action that expresses an intention not to perform the contract." *Id.*[7]

¶26 Under the terms of the License Agreement,

> VersusLaw shall deliver a complete, exact duplicate copy of the entirety of the Licensed Materials and Software to Matthew Bender in accordance with the delivery schedule (the "Delivery Schedule") to be agreed upon by the parties hereto (whereupon the Delivery Schedule shall be incorporated into this Agreement by reference), and in any event, no later than September

[7] Stoel Rives relies on *Hemisphere Loggers & Contractors, Inc. v. Everett Plywood Corp.*, 7 Wn. App. 232, 234, 499 P.2d 85 (1972), to argue that even if Matthew Bender repudiated the License Agreement in December 1997 or spring 1998, VersusLaw's cause of action for breach of the License Agreement did not accrue until September 30, 1998, because Matthew Bender could have withdrawn its repudiation. *Hemisphere Loggers* does not support this argument. The court in *Hemisphere Loggers* considered whether termination made without notice as required in the contract was effective. The court held that because the other party had breached and repudiated the contract before termination, compliance with the termination notice provision was unnecessary. In the opinion, the court stated:

> Repudiation of a contract by one party may be treated by the injured party as a breach which will excuse his own performance. . . . Repudiation, however, does not of itself terminate a contract. A repudiating party who is not otherwise in default may withdraw his repudiation if the injured party has not acted in reliance upon it. But, if there has been a material change of position in reliance upon a repudiation, an attempted retraction comes too late.

*Hemisphere Loggers*, 7 Wn. App. at 234 (citations omitted). The court also quoted *McFerran v. Heroux*, 44 Wn.2d 631, 640, 269 P.2d 815, 821 (1954), " 'where a party to a contract repudiates the contract . . . an action for damages brought immediately is not premature.' " *Hemisphere Loggers*, 7 Wn. App. at 234.

30, 1998, in the format and to specifications that are acceptable to Matthew Bender and VersusLaw.[8]

¶27 The License Agreement also provides that Matthew Bender could not reject the database except "for substantial or material reasons such that the data received is unusable."[9] Stoel Rives relies on this provision to argue that as a matter of law VersusLaw's claim for royalties could not accrue until September 30, 1998. Because the parties did not agree to a delivery schedule, Stoel Rives claims the delivery date was September 30, 1998. Construing the evidence in the light most favorable to VersusLaw, the terms of the License Agreement and the evidence in the record do not support Stoel Rives' arguments.

¶28 While there is no dispute that the parties did not agree to a written delivery schedule, the agreement to deliver "no later than September 30, 1998," does not mean VersusLaw could not deliver before that date.[10] The parties anticipated VersusLaw would deliver the database as soon as possible and on an ongoing basis. Matthew Bender wanted to provide access to VersusLaw's database to its customers in early 1998. As soon as the parties entered into the License Agreement in October 1997, Matthew Bender was anxious to receive VersusLaw's database and requested VersusLaw immediately provide data for the first three states so Matthew Bender could begin work on conversion programs. The License Agreement also contemplated an "initial and ongoing delivery" of VersusLaw's database.[11]

¶29 VersusLaw claims Matthew Bender's refusal to accept delivery of the database was a repudiation of the License Agreement that gave rise to VersusLaw's claim for unpaid royalties in spring 1998, and the August 2000 counterclaim for royalties filed in the Matthew Bender arbitration was not timely. The License Agreement states,

[8] CP at 460.

[9] CP at 460.

[10] CP at 460.

[11] CP at 460.

"No legal action may be brought in connection with this agreement, the licensed materials, or any performance or nonperformance hereunder, more than two years after the cause of action has accrued."[12]

¶30 Stoel Rives argues Matthew Bender's refusal to accept VersusLaw's database should be characterized as a negotiation under the License Agreement for a delivery date. But there is no dispute that Matthew Bender never accepted delivery of VersusLaw's database and that after Lexis acquired Matthew Bender, Lexis had no interest in VersusLaw's database.

¶31 Viewing the evidence in the light most favorable to VersusLaw establishes VersusLaw attempted to deliver the licensed materials to Matthew Bender in December 1997 and again in the spring of 1998, and Matthew Bender refused to accept delivery of the database each time. Acton testified that when he told Matthew Bender in December 1997 that VersusLaw was ready to send its database, Matthew Bender said not to bother sending it, and "if you send it, we will refuse it and turn it around."[13] Barbara DeYoung, Vice President of Electronic Publishing for Matthew Bender, testified that in spring 1998 she was instructed by Matthew Bender to tell VersusLaw not to send any more data.

¶32 We conclude there are material issues of fact about when Matthew Bender repudiated the Licensing Agreement. The trial court erred when it ruled as a matter of law that VersusLaw's claim for unpaid royalties did not accrue until September 30, 1998.

*Damages*

¶33 The trial court ruled as a matter of law that VersusLaw did not incur any damages. Stoel Rives argued below and argues on appeal that the only damages VersusLaw could claim under the License Agreement were

---

[12] CP at 459 (original in all caps).

[13] CP at 229-30.

unpaid royalties, and the other damages VersusLaw claims were barred by the terms of the License Agreement.[14] Stoel Rives also contends the settlement agreement with Matthew Bender fully compensated VersusLaw for the unpaid royalties due under the License Agreement. VersusLaw argues the trial court erred in granting summary judgment because there are material issues of fact regarding damages.[15]

■ ¶34 Stoel Rives relies on the limitation of liability clause in the License Agreement to argue that unpaid royalties were the only damages VersusLaw could claim. The limitation of liability provides, in part:

IN NO EVENT SHALL EITHER PARTY . . . BE LIABLE TO THE OTHER PARTY . . . FOR LOST PROFITS, LOST REVENUES OR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER ARISING FROM THE LICENSE OF THE LICENSED MATERIALS HEREUNDER. . . . IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER UNDER THIS LICENSE OR USE OF THE LICENSED MATERIALS BY THE OTHER OR ANY OF THEIR RESPECTIVE AFFILIATES EXCEED $7,500,000. THE ABOVE LIMITATIONS SHALL APPLY TO ALL CLAIMS BETWEEN THE PARTIES WHETHER ARISING FROM BREACH OF WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), INDEMNITY, INFRINGEMENT DEFENSE, STRICT LIABILITY, OR OTHERWISE, EVEN IF VERSUSLAW OR MATTHEW BENDER HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.[16]

---

[14] The damages VersusLaw claimed in the malpractice lawsuit against Stoel Rives included $7 million in unpaid royalties, having to repay the loan from Matthew Bender on an accelerated basis, including Matthew Bender and Lexis/Nexis banner advertisements on VersusLaw's website, and attorney fees paid to Stoel Rives and Danielson, Harrigan & Tollefson.

[15] Stoel Rives contends that because VersusLaw did not specifically assign error to the portion of the trial court's summary judgment order that concluded as a matter of law that VersusLaw suffered no damages, VersusLaw waived this issue on appeal. The trial court granted summary judgment on three separate grounds including damages and VersusLaw appealed the order granting summary judgment. The issue was not waived.

[16] CP at 458-59.

This provision limits only the liability of VersusLaw and Matthew Bender to each other under the contract. The liability clause in the Licensing Agreement does not limit the scope of damages VersusLaw may recover from Stoel Rives.

■ ¶35 Stoel Rives contends that as a matter of law VersusLaw was fully compensated for unpaid royalties by the November 2001 settlement agreement with Matthew Bender. According to Stoel Rives, VersusLaw claimed $1,924,948 in unpaid royalties from Matthew Bender but obtained a set-off for the $1,290,400 in interest VersusLaw owed Matthew Bender on a loan and a $1,000,000 loan reduction. Even if we accept Stoel Rives' calculations and its characterization of the settlement agreement, if VersusLaw received $2,290,400 to offset unpaid royalties, that amount is still $434,600 less than the $2,725,000 minimum royalty payment guaranteed by the License Agreement.[17]

¶36 Stoel Rives argues VersusLaw was entitled to recover the royalties that accrued only between when Matthew Bender breached the License Agreement and when the agreement was terminated pursuant to the settlement agreement. In support of this argument, Stoel Rives relies on several out-of-state cases that stand for the proposition

---

[17] The License Agreement provides for a guaranteed minimum monthly royalty payment for 60 months. Because the minimum is phased in over the first 11 months, the minimum royalty for the first 12 months is $325,000. The minimum royalty for the following 48 months is $2,400,000. The total minimum royalty for the first 60 months is $2,725,000.

After 60 months, the required royalty is the "Alternate Royalty," which is defined in the agreement as "the amount equal to ten percent (10%) of the Net Receipts from the sale or license by Matthew Bender of materials from the Licensed Materials during the relevant accounting period." CP at 453. If there are no net receipts, no royalty is due. There is therefore a question of fact regarding whether and how much VersusLaw would have received in royalty payments after the first 60 months of the License Agreement. *See Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 109 Wn.2d 923, 750 P.2d 231 (1988) (Damages can be awarded for the loss of prospective profits from a new business if the evidence includes a substantial and sufficient factual basis for projecting profits; but an expert opinion as to prospective profits must be based on market conditions and profit shown of similar businesses operating under substantially the same conditions.). There are also material issues of fact about how to characterize the Settlement Agreement.

that lost profits cannot be awarded as damages beyond the mutually agreed termination date of a contract.[18] These cases do not address VersusLaw's claim for damages caused by Stoel Rives' alleged negligent representation in the transaction with Matthew Bender.

¶37 VersusLaw relies on the declarations of Joseph Acton and expert witness Neal Beaton to argue these are material issues of fact regarding whether it suffered damages because of Stoel Rives' negligence. Acton's declaration enumerates several categories of damages he claims VersusLaw incurred because of Stoel Rives' breach,[19] including the loss of a claim for anticipated royalties from Matthew Bender, attorney fees and arbitration costs, and the additional costs related to the accelerated payment of the loan.[20] In Beaton's declaration he stated that if Stoel Rives had not been negligent, VersusLaw would have

[18] Stoel Rives relies on *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 961-63 (8th Cir. 2000); *All Line, Inc. v. Rabar Corp.*, 919 F.2d 475 (7th Cir. 1990); *Osborn v. Commanche Cattle Industries, Inc.*, 1975 OK CIV APP 67, 545 P.2d 827; *Buckley v. Coe*, 385 S.W.2d 354, 358 (Mo. 1964); *Evans v. Rancho Royale Hotel Co.*, 114 Cal. App. 2d 503, 250 P.2d 283 (1952); and *Carter v. Dean*, 317 S.W.2d 607 (Tex. Civ. App. 1958).

[19] Acton's declaration states that VersusLaw's damages include: (1) attorney fees paid to Stoel Rives and its successor in the arbitration, (2) fees paid to the American Arbitration Association for the arbitration and attorney fees paid to "monitoring counsel," (3) the accelerated payment of $1 million on the loan, (4) monthly interest payments that are required under the settlement agreement instead of the initial requirement for semiannual interest payments, (5) the loss of a "multimillion dollar claim for royalties from Matthew Bender," (6) the loss of the effect of VersusLaw's exposing its product to Matthew Bender's customers, (7) the loss of anticipated revenue from royalties due from Matthew Bender, and (8) the loss of an opportunity to participate in the initial public offering boom between 1997 and 2000. CP at 996-97.

[20] Stoel Rives contends Acton's declaration contradicts his deposition testimony that VersusLaw's only alleged damages are the unpaid royalties arising from the license agreement. But Acton testified at his deposition that while the unpaid royalties under the license agreement were the principal part of the damages VersusLaw was seeking, VersusLaw was also claiming other damages, including the attorney fees it paid in the course of the arbitration. CP at 304.

Stoel Rives also contends Acton's declaration contains conclusory statements of fact. But taking the evidence in the light most favorable to VersusLaw, Acton's declaration creates a material issue of fact regarding VersusLaw's damages, including whether VersusLaw incurred attorney fees and other costs for the arbitration, the cost of accelerated payment on the loan, and the compromise of VersusLaw's claim for unpaid royalties against Matthew Bender.

received royalties under the License Agreement through at least 2012. According to Beaton, the proper measure of damages is the difference between the amount VersusLaw received in the settlement agreement with Matthew Bender and the minimum royalties due under the full term of the License Agreement.

¶38 Construing the evidence in the light most favorable to VersusLaw, Acton's and Beaton's declarations create material issues of fact regarding damages VersusLaw incurred because of Stoel Rives' allegedly negligent representation of VersusLaw. And as previously described, even if VersusLaw's damages were limited to the difference between the royalties it could have obtained from Matthew Bender for its breach of the License Agreement and the amount Stoel Rives contends VersusLaw obtained under the settlement agreement, there is at least a $434,600 discrepancy between the credit VersusLaw obtained under the settlement agreement and the minimum royalty due under the License Agreement.

¶39 Stoel Rives contends VersusLaw's damages were caused by Matthew Bender's breach of the License Agreement and VersusLaw's decision to enter into a settlement agreement with Matthew Bender. Stoel Rives' contention assumes VersusLaw's only damages are the unpaid royalties it was unable to obtain in the settlement agreement. VersusLaw has presented evidence to create a material issue of fact regarding those damages, as well as other damages, including the costs VersusLaw incurred in having to participate in the arbitration and in the accelerated repayment of the loan.[21] VersusLaw also claims Stoel Rives and Elvins' negligent representation of VersusLaw resulted in the disadvantageous settlement of its counterclaim for royalties against Matthew Bender.[22] This is a question of

---

[21] *See* CP at 996-97.

[22] In his Declaration in Opposition to Defendants' Motion for Summary Judgment, Acton said, "It is because of the loss of any bargaining power that VersusLaw had concerning the lost royalties which forced and was [sic] the primary driver of the settlement with Matthew Bender." CP at 996.

fact for a jury to decide. *Flint v. Hart*, 82 Wn. App. 209, 220-21, 917 P.2d 590 (1996).

¶40 The trial court erred when it ruled as a matter of law that VersusLaw did not incur any damages.

*Proximate cause*

¶41 The trial court ruled, "There is no proximate cause between [VersusLaw]'s alleged damages and the alleged actions of Defendant Stoel Rives and Elvins because, as a matter of law, there is no 'cause in fact' and no 'legal causation.' "[23] VersusLaw contends the trial court erred in concluding as a matter of law the acts or omissions of Stoel Rives did not proximately cause VersusLaw's damages.

¶42 General principles of causation are no different in a legal malpractice action than in an ordinary negligence case. *Sherry v. Diercks*, 29 Wn. App. 433, 437, 628 P.2d 1336 (1981). To recover, the plaintiff must demonstrate that he or she would have achieved a better result had the attorney not been negligent. *Id.* at 438. Proximate cause consists of two elements: cause in fact and legal causation. *City of Seattle v. Blume*, 134 Wn.2d 243, 251, 947 P.2d 223 (1997). "Cause in fact refers to the 'but for' consequences of an act, that is, the immediate connection between an act and an injury." *Blume*, 134 Wn.2d at 251-52. The "but for" test requires a party to establish that the act or omission complained of probably caused the subsequent injury. *Nielson v. Eisenhower & Carlson*, 100 Wn. App. 584, 591, 999 P.2d 42 (2000). Legal causation rests on considerations of policy determining how far a party's responsibility should extend. *Blume*, 134 Wn.2d at 252. It involves the question of whether liability should attach as a matter of law, even if the proof establishes cause in fact. *Id.* Proximate cause may be determined as a matter of law only when reasonable minds could reach but one conclusion. *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 203-04, 15 P.3d 1283 (2001).

---

[23] CP at 1251-52.

¶43 On this record, there are material issues of fact about whether Stoel Rives negligently represented VersusLaw and VersusLaw's damages. Whether Stoel Rives' alleged negligence caused VersusLaw's damages is a question of fact for a jury to decide. *Flint v. Hart*, 82 Wn. App. at 220-21.[24] The trial court erred when it concluded that as a matter of law Stoel Rives' conduct did not proximately cause VersusLaw's damages.

*VersusLaw's Motion to Compel Production of Stoel Rives' Lawyer Communications*

¶44 VersusLaw contends the trial court erred when it did not rule on its pending motion to compel discovery of communications between Elvins and other Stoel Rives attorneys. VersusLaw also contends the withheld documents are not protected by the attorney-client privilege.

¶45 Elvins was the Stoel Rives lawyer who represented VersusLaw in the arbitration with Matthew Bender. E. Joseph Dean was Stoel Rives' in-house loss prevention attorney. Dean provided legal advice to Stoel Rives attorneys on ethical and legal issues. Elvins consulted with Dean about Stoel Rives' representation of VersusLaw in the arbitration and the two-year limitation for filing VersusLaw's claim for royalties under the License Agreement.

¶46 On December 27, 2000, Elvins told Acton she was going to inform her malpractice insurance carrier, ALAS, that VersusLaw's claim for royalties might have been compromised by Stoel Rives' failure to advise VersusLaw to timely file its claim. Elvins told Acton that VersusLaw

---

[24] VersusLaw's decision to settle its dispute with Matthew Bender does not necessarily insulate Stoel Rives from liability. *Flint,* 82 Wn. App. 209; *Blume,* 134 Wn.2d 243. In *Flint,* the court concluded that whether an exercise of independent judgment to settle a claim was a reasonable attempt to mitigate damages in a given case is a question of fact. *Flint,* 82 Wn. App. at 220-21. In *Blume,* the court held that where a plaintiff settled a claim instead of pursuing available legal remedies, the court must decide based on traditional principles of proximate causation whether a defendant was the cause of the injuries suffered and whether the duty to mitigate was met. *Blume,* 134 Wn.2d at 260.

might have a malpractice claim against Stoel Rives. On January 11, 2001, Elvins wrote Acton a letter informing him of a potential legal malpractice claim against Stoel Rives for failing to advise VersusLaw to timely file its claim for royalties against Matthew Bender. In the letter, Elvins refers to a previous conversation that she had with Acton on August 22, 2000, about the potential malpractice claim. The letter asks Acton to confirm in writing that Stoel Rives would continue to represent VersusLaw in the arbitration. According to Elvins, Acton terminated Stoel Rives as VersusLaw's lawyer on January 22, 2001. Acton said he first learned about VersusLaw's potential claim for legal malpractice against Stoel Rives when he talked to Elvins on December 27, 2000. Acton testified that Elvins did not tell him in August 2000 about VersusLaw's potential malpractice claim against Stoel Rives. Acton also stated that he terminated his relationship with Stoel Rives on January 23, 2001, not January 22.

¶47 During the deposition of Elvins, VersusLaw learned there were communications between Elvins and Dean about Stoel Rives' representation of VersusLaw in the arbitration. Stoel Rives subsequently confirmed there were two memoranda, one dated November 2, 2000 and the other dated January 22, 2001, that were protected by the attorney-client privilege. On March 18, 2003, the trial court ruled the communications between Elvins and Dean were protected by the attorney-client privilege and denied VersusLaw's motion to compel. After further discovery, VersusLaw learned about additional Stoel Rives communications. VersusLaw filed another motion to compel and asked the court to modify its previous order or require Stoel Rives to waive their claim of attorney-client privilege. VersusLaw's motion to compel was pending when the trial court dismissed VersusLaw's lawsuit on summary judgment.

■ ¶48 VersusLaw argues the trial court erred in failing to rule on the pending motion to compel.[25] But VersusLaw cites no authority that supports its argument that a trial court should rule on a discovery motion even though summary judgment dismissal renders the pending motion moot. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). The trial court did not err when it declined to rule on VersusLaw's second motion to compel after dismissing the lawsuit on summary judgment.[26]

■ ¶49 Because we reverse the summary judgment dismissal of VersusLaw's lawsuit, the trial court on remand will need to consider and rule on VersusLaw's motion to compel. Before deciding VersusLaw's motion to compel, the court must conduct an in camera review and consider a number of factors in deciding whether the Stoel Rives communications should be produced. When disclosure of evidence is opposed on the basis of privilege, an in camera review is the only way a court can determine whether a document is exempt from disclosure. *See State v. Jones*, 96 Wn. App. 369, 377, 979 P.2d 898 (1999).[27]

■ ¶50 VersusLaw contends Stoel Rives cannot assert the attorney-client privilege for communications that occurred during Stoel Rives' representation of VersusLaw because Stoel Rives' duty to VersusLaw as its client is

---

[25] VersusLaw's only argument for why the trial court should have ruled on this issue despite the fact that it dismissed the suit on summary judgment is that the court's failure to rule was "contrary to its own repeated promise that it would rule on this issue." Appellant's Br. at 26-27.

[26] Stoel Rives contends that if VersusLaw believed the motion to compel would disclose evidence material to its motion for summary judgment, it should have requested a continuance of the summary judgment motion pending resolution of its discovery motion. VersusLaw replies that it was not required to move for a continuance because the court indicated at the summary judgment hearing that it would rule on the discovery motion. We do not need to address this issue because neither party has argued that the withheld documents were relevant to the summary judgment motion, and the motion to compel was moot once the trial court dismissed the case on summary judgment.

[27] We conclude that by failing to conduct an in camera review, the trial court erred in denying VersusLaw's motion to compel production of the November 2, 2000 and January 22, 2001 e-mail memoranda. On remand, the trial court will need to also review these documents and decide whether they should be produced.

paramount to Stoel Rives' conflicting interests. The applicability of the attorney-client privilege must be determined on a case-by-case basis and the burden of showing the privilege applies falls on Stoel Rives, as the party asserting the privilege. *See Dietz v. Doe*, 131 Wn.2d 835, 843-44, 935 P.2d 611 (1977).

¶51 Washington's attorney-client privilege is set forth in RCW 5.60.060(2)(a).[28] The attorney-client privilege applies to communications and advice between an attorney and client and extends to documents that contain a privileged communication. *Dietz*, 131 Wn.2d at 842. Because the privilege sometimes results in the exclusion of evidence otherwise relevant and material, and thus may be contrary to the philosophy that justice can be achieved only with the fullest disclosure of the facts, the privilege is not absolute; rather, it is limited to the purpose for which it exists. *Dietz*, 131 Wn.2d at 843; *see also Baldrige v. Shapiro*, 455 U.S. 345, 360, 102 S. Ct. 1103, 71 L. Ed. 2d 199 (1982) (Statutes establishing evidentiary privileges must be construed narrowly because privileges impede the search for the truth.).

¶52 VersusLaw and Stoel Rives agree the attorney-client privilege can apply to communications between Elvins and Dean. Lawyers in a law firm seeking legal advice from another lawyer in the same firm can assert the attorney-client privilege. *See, e.g., United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996); *Hertzog, Calamari & Gleason v. Prudential Ins. Co.*, 850 F. Supp. 255 (S.D.N.Y. 1994); *In re Sunrise Sec. Litig.*, 130 F.R.D. 560 (E.D. Pa. 1989).

¶53 The court on remand will need to determine whether Stoel Rives met its burden of showing the attorney-client privilege applies to the Stoel Rives documents. If the privilege applies, then the trial court will need to carefully examine the documents to determine whether the

---

[28] "An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." RCW 5.60.060(2)(a).

communications between Elvins and Dean create a conflict between the law firm's own interests and its fiduciary duty to its client, VersusLaw.

¶54 " 'The attorney-client relationship is a fiduciary one as a matter of law and thus the attorney owes the highest duty to the client.' " *Kelly v. Foster*, 62 Wn. App. 150, 155, 813 P.2d 598 (1991) (quoting *Perez v. Pappas*, 98 Wn.2d 835, 840-41, 659 P.2d 475 (1983)). A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's own interests unless the lawyer reasonably believes the representation will not be adversely affected and the client consents in writing after a full disclosure of the material facts. Rule of Professional Conduct (RPC) 1.7(b).[29]

¶55 The question is whether a law firm can maintain an adverse attorney-client privilege against an existing client. Stoel Rives cites a number of cases where the attorney-client privilege applies to in-house law firm communications. *See, e.g., United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996); *Hertzog*, 850 F. Supp. 255; *Lama Holding Co. v. Shearman & Sterling*, No. 89 CIV 3639 (KTD), noted at 1991 WL 115052, 1991 U.S. Dist. LEXIS 7987 (S.D.N.Y.

---

[29] RPC 1.7 provides in part:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) Each client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure).

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

1991). But while these cases recognize the attorney-client privilege can apply to intra-firm communications, none of the cases Stoel Rives cites and relies on address whether the attorney-client privilege can be asserted against a law firm's then-current client. In addition, Stoel Rives does not cite any case where the attorney-client privilege protects communications in these circumstances.[30] VersusLaw, however, cites authority from other jurisdictions that communications between lawyers in a firm that conflict with the interest of the firm's client may not be protected from disclosure to the client by the attorney-client privilege. *See Koen Book Distribs. v. Powell, Trachman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283, 286 (E.D. Pa. 2002); *see also Sunrise*, 130 F.R.D. 560; *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 220 F. Supp. 2d 283 (S.D.N.Y. 2002).[31] When a law firm seeks advice from its in-house lawyer concerning potential malpractice in its representation of a client, the law firm's position can be adverse to or limit the law firm's representation of its client and create a conflict of interest.

¶56 In determining whether there is a conflict between the law firm's own interests and its fiduciary duty to VersusLaw, it will be important for the court to focus on the

---

[30] Stoel Rives' citation to *Sunrise*, 130 F.R.D. 560, Respondent's Brief at 37 n.16, is misleading. In *Sunrise*, the court held it is possible in some instances for a law firm to receive the benefit of the attorney-client privilege when seeking legal advice from in-house counsel. *Sunrise*, 130 F.R.D. at 595. But the court limited the privilege to only those documents that did not contain communications or legal advice in which the firm's representation of itself violates an ethical rule regarding representation of multiple clients with conflicting interests. *Sunrise*, 130 F.R.D. at 597. *Sunrise* therefore supports VersusLaw's position.

[31] Stoel Rives attempts to distinguish *Koen Book Distributors* on the grounds that in that case, the attorneys never sought their clients' consent nor fully disclosed the potential conflict of interest. Stoel Rives argues that *Koen Book Distributors* is inapplicable because Elvins made full disclosure to VersusLaw both orally and in writing, and VersusLaw president Acton terminated Stoel Rives' representation of VersusLaw. Stoel Rives relies on Elvins' assertions that she told Acton about the potential conflict of interest between Stoel Rives and VersusLaw on August 22, 2000, but Acton denies that such a conversation took place. There is, accordingly, a question of fact regarding when Stoel Rives knew about the potential conflict of interest and when and what Elvins disclosed to Acton. Importantly, there is no evidence in the record that VersusLaw ever agreed in writing to waive the potential conflict as required under RPC 1.7.

timing and relationship between the parties. The court will also need to resolve when Acton terminated the attorney-client relationship with Stoel Rives and when Stoel Rives knew VersusLaw had a potential claim for malpractice.

## CONCLUSION

¶57 We conclude VersusLaw has established there are material issues of fact regarding whether its claim for unpaid royalties accrued before September 30, 1998, and whether the two-year time limitation in the License Agreement expired before VersusLaw asserted its counterclaim against Matthew Bender in the arbitration. VersusLaw has also established material issues of fact regarding damages and whether Stoel Rives' negligence proximately caused those damages. We reverse the trial court's decision to grant summary judgment, vacate the final judgment entered on November 3, 2003, and remand for further proceedings consistent with this opinion.

Cox, C.J., and COLEMAN, J., concur.

Reconsideration denied May 5, 2005.

Review denied at 156 Wn.2d 1008 (2006).