IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOE M. ESKRIDGE, MD and JUDY Y. ESKRIDGE, husband and wife, | ) ) ) ) | No. 78013-1-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | |
| | ) | UNPUBLISHED OPINION |
| KELBY DAHMER FLETCHER and, STOKES LAWRENCE, P.S., a Washington Professional Service Corporation, | ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | FILED: June 24, 2019 |

SCHINDLER, J. — Dr. Joseph Eskridge appeals summary judgment dismissal of his legal malpractice lawsuit against attorney Kelby Fletcher and Stokes Lawrence PS. We affirm.

Employment at Swedish Medical Center

Dr. Joseph Eskridge is a neuroradiologist who performs neuro endovascular surgery. Dr. Eskridge began working at the Swedish Medical Center Neuroscience Institute in 2004. Dr. Eskridge agreed to and signed the terms and conditions of the Swedish Medical Center (Swedish) "Information Confidentiality and Non-Disclosure

Agreement" (Information Confidentiality Agreement) in 2004 and every two years thereafter. The 2012 Information Confidentiality Agreement states, in pertinent part:

1. I will access, use and disclose minimum confidential information only as necessary to perform my job functions. This means, among other things, that:
   a.) I will only access, use, and disclose the minimum confidential information as authorized to do my job;
   b.) I will not in any way access, use, divulge, copy, release, sell, loan, review, alter, or destroy any confidential information except as properly and clearly authorized within the scope of my job and in accordance with all applicable Swedish policies and procedures and with all applicable laws;
   . . . .

. . . .
3. I understand that it is my responsibility to be aware of Swedish policies regarding electronic communications and other policies that specifically address the handling of confidential information and misconduct that warrants corrective disciplinary action.
. . . .
5. I understand that any fraudulent application, violation of confidentiality or any violation of the above provisions may result in disciplinary action . . . up to and including termination of employment and/or affiliation with Swedish.

The Information Confidentiality Agreement defines "confidential information" as "[p]atient information (medical records, conversations, demographic information, financial information)."

In 2009, Swedish required Dr. Eskridge to engage in and complete a "clinical corrective action plan."

Washington Physicians Health Program Evaluation

In 2013, Madigan Army Medical Center neurologist Dr. Yince Loh worked part-time at the Swedish Neuroscience Institute. On September 10, 2013, Dr. Eskridge made "crude" and "rude" comments in phone calls and text messages to Dr. Loh. Dr.

2

Loh reported the behavior of Dr. Eskridge to Swedish. Dr. Loh believed Dr. Eskridge was intoxicated.

On September 13, Swedish medical staff contacted the Washington Physicians Health Program (WPHP) regarding "multiple episodes" of Dr. Eskridge "lashing out at other staff," concerns about intoxication, and the September 10 communications with Dr. Loh. Swedish suspended Dr. Eskridge's clinical privileges and directed him to call WPHP to obtain an assessment.

Dr. Eskridge met with WPHP psychiatrist Dr. Charles Meredith on September 26. Dr. Eskridge admitted drinking "several glasses of wine" and arguing with Dr. Loh on September 10. Dr. Eskridge denied any other episodes of "being verbally aggressive." However, contrary to Dr. Eskridge's assertion, Dr. Meredith notes, "The documentation provided by Swedish indicates there have been a number of such incidents since 2008."

Dr. Meredith diagnosed Dr. Eskridge with "[a]lcohol abuse." Dr. Meredith states Dr. Eskridge "does admit to what is in my opinion an unhealthy level of alcohol consumption, although it is not clear that he is dependent."

> We do have concerns about his alcohol use. Questions have been raised on occasion apparently by his wife regarding his alcohol use in the past and certainly have recently been raised in his professional environment. There are implications that his alcohol use may have negatively impacted his behavior in recent stressful interactions with colleagues.

Dr. Eskridge agreed to participate in mental health treatment and a one-year monitoring program. At the end of the one-year monitoring period in fall 2014, Dr. Eskridge told Dr. Meredith that "he still needs to work on 'diplomacy skills' with providers such as the neurologist with whom he had an interpersonal dispute that led to his referral here." Dr. Eskridge agreed that "his alcohol intoxication contributed to his

3

situation and he needs to be mindful and conservative in his use if he drinks recreationally again."

Letter to Madigan

On April 26, 2015, Dr. Eskridge "contacted the Madigan Command office by phone." Dr. Eskridge identified himself as "Dr. Mike" and requested a fax number and e-mail address. The next day on April 27, Dr. Eskridge sent an unsigned letter by e-mail to the Office of the Army Inspector General. The letter criticizes the treatment Dr. Loh provided to seven Swedish patients and asserts Dr. Loh engaged in "activities that violate Army policy and the federal False Claims Act Anti-Kickback Statute." Dr. Eskridge identifies the seven patients by "name, medical record number, age, diagnosis, procedure information including procedure date, and discharge status."

The e-mail address Dr. Eskridge used to send the letter contained his name. On April 28, Madigan personnel called Dr. Eskridge about the letter he sent by e-mail. Dr. Eskridge "again claimed to be Dr. Mike until he was told that his identity had been revealed in his email." Madigan personnel notified "Army Criminal Investigation" because "Dr. Eskridge's actions were considered irregular and suspicious."

At the request of Dr. Loh, on May 20, Madigan chief of medicine Dr. Jay Erickson notified Swedish of the assertions Dr. Eskridge made in the letter "so that Swedish could conduct an internal investigation as deemed appropriate."

> Dr. Loh requested that I inform you about Dr. Eskridge's communications with Madigan last month. As you may know, Dr. Eskridge sent a report to Madigan on April 27, 2015 containing numerous allegations about Dr. Loh's medical care and professional conduct.
>
> Dr. Eskridge contacted the Madigan Command office by phone on April 26, 2015 under a false name, identifying himself as Dr. Mike. He requested a fax number and email contact from the office secretary. On

April 27, 2015, he sent an accusatory report about Dr. Loh via email to the office secretary. The report was written in an unusual style/format similar to a newspaper article. It contained private health information and was anonymous. The office secretary determined that the email came from Dr. Eskridge because the originating email address contained his name. When he was contacted by phone on April 28, 2015 he again claimed to be Dr. Mike until he was told that his identity had been revealed in his email.

<u>Investigation and Review of Letter Sent to Madigan</u>

Madigan conducted an investigation of Dr. Loh. On May 20, Madigan concluded there were "no substantiated findings of sub-standard care or unprofessional actions by LTC[1] Loh at Madigan."

Swedish hired an "external reviewer" to investigate Dr. Loh's care of patients. The external reviewer "found Dr. Loh provided quality care to the patients and no deficiencies were discovered."

On June 4, Swedish placed a "precautionary restriction" on Dr. Eskridge's medical staff privileges and notified him that the Professional Behavior Quality Review Committee and the Medical Executive Committee (MEC) planned to conduct a review of the letter he sent to Madigan.

On June 5, the chief of staff at Swedish sent a letter to Dr. Eskridge stating, "[I]t is suspected that you accessed those patient charts without proper authorization" and "you may have violated [the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. 104-191, 110 Stat. 1936,] and Swedish policies by releasing protected health information to third parties without proper consent."[2] The letter attached a copy of the Swedish policy on "Integrity, Compliance, Privacy and Security" and the "Levels

---

[1] Lieutenant Colonel.

[2] HIPAA limits disclosure of protected health information without the patient's consent. 45 C.F.R. § 164.502.

of Violation." The policy states the level of violation is determined "according to the severity of the violation"—"Level One" is an unintentional violation, "Level Two" is an "Intentional Violation Not for Personal Gain or Malice," and "Level Three" is an "Intentional Violation for Personal Gain or Malice."[3]

Dr. Eskridge contacted Kelby Fletcher, an employment attorney at Stokes Lawrence PS (collectively, Fletcher). On June 10, Fletcher and Stokes Lawrence attorney Thomas Lerner met with Dr. Eskridge. Lerner had experience in representing medical professionals and institutions. Lerner addressed the consequences of revocation of medical privileges at Swedish. Lerner told Dr. Eskridge that revocation of privileges would result in a report to the Washington State Department of Health Medical Quality Assurance Commission (MQAC) and the National Practitioner Data Bank.

On June 15, Fletcher sent "Engagement Terms" and a letter to Dr. Eskridge confirming Fletcher will represent Dr. Eskridge "in connection with your employment at Swedish Neurological Institute."

On June 23, Swedish privacy officer Tracy Howes and Swedish hospital attorney Peter Kim interviewed Dr. Eskridge. Fletcher attended the interview. Dr. Eskridge admitted that he accessed the Swedish medical records of patients with whom he had no treatment relationship in order to obtain the patient information in the letter to Madigan. Dr. Eskridge said he reported his concerns about the care Dr. Loh provided to patients to the former director of the Swedish Neuroscience Institute Dr. John Henson. Dr. Eskridge said he sent the letter to Madigan because he "felt" Dr. Henson did not take any action. When asked why he did not "use any of the Swedish

---

[3] Boldface omitted.

6

mechanisms for reporting and addressing substandard care," Dr. Eskridge said he "forgot he could report it via eQVR[4] and he didn't know he could report it to Compliance." When asked if any of his cases had been the subject of an internal investigation, Dr. Eskridge admitted he "may have had one case reviewed." Contrary to his assertion, Swedish records showed that between 2005 and 2015, the internal Cardiovascular Review Committee reviewed over 14 of his cases.

On July 1, Howes issued a case investigation report to the MEC. The report states Dr. Eskridge improperly accessed Swedish patient records "outside of any treatment or Swedish managed or approved clinical quality or performance improvement process" and "made an unauthorized disclosure of patient information."

On July 14, Fletcher sent an e-mail to Dr. Eskridge regarding the "[u]pcoming MEC action."

> We will say that you acted in good faith on the reasonable belief that you could convey the information to Madigan. I don't know what the grounds are for revocation of your privileges, etc. and that is why I requested the by-laws from [Swedish attorney] Ms[.] [Betsy] Vo. There is a hearing procedure for Swedish to follow in order for this to occur and it will have the burden of proof, if I recall correctly.
>
> Until we know more about how they want to proceed, we are just guessing. It will be the HIP[A]A issue, for sure. And it could involve an allegation that you were acting unprofessionally or something of the sort.

Fletcher told Dr. Eskridge in the e-mail that he would obtain a copy of the Swedish policies and bylaws. Fletcher sent an e-mail to Dr. Eskridge the next day on July 15. Fletcher informed Dr. Eskridge, "[Y]ou will have the burden of proving by clear and convincing evidence that any adverse action against you was arbitrary or 'unreasonable.' " Fletcher told Dr. Eskridge, "I don't think you have a winnable

---

4 Electronic quality variance report.

retaliation claim if they press forward on the patient privacy issue." Fletcher cites the following Swedish policy provisions:

> At p.[5] 1, an element of the policy is "assuring compliance with all applicable state and federal laws, including those providing for the privacy and security of protected health information . . . ."
>
> At p. 3 a responsibility of a 'workforce member' is compliance with [Swedish] Code of Conduct, HIPAA regulations and system policies. Workforce members "must protect confidential information including . . . . PHI [(protected health information)] . . . ."
>
> An example of violation of Integrity, Compliance, Privacy and Security (ICPS) functions is a violation of [Swedish] policies. Also on p. 3.
>
> Another ICPS violation is disclosing patient names for an <u>unauthorized purpose</u>. You would contend that the disclosure, you thought, was authorized.
>
> There are various level[s] of violation - unintentional, intentional and not for personal gain or malice[,] and intentional for personal gain or malice.
>
> As for the second level, that includes disclosing PHI "<u>when there is no job-related need to access</u>, use or disclose . . . ." Here, again, you want to say this was, in fact, job related - it had to do with patient care and improper payment. That is a stretch, I suppose, they will say: You should have used internal [Swedish] processes rather than going outside of [Swedish]. But, it is a defense.[6]

Fletcher told Dr. Eskridge that Swedish "will look at whether you failed to check whether your course of action was prohibited." Fletcher also notes Swedish "could contend that your reports about [Dr.] Loh were retaliatory for the complaints he had about you some years ago leading to your supervision" and "they could contend that you concealed the violation by not using your name on the letter to Madigan." Fletcher asked Dr. Eskridge, "Can they claim there is a pattern? Are there any other things you've done which led to any investigations?"

---

[5] Page.
[6] Emphasis in original; ellipses in original.

Fletcher said, "I've not yet looked at the regulations regarding the National Physician Data Bank and what and how anything here would be reported." However, Fletcher told Dr. Eskridge:

> At your stage of career and with your accomplishments, I wonder if it really would make any difference going forward with another institution. Depending on what [Swedish] does tomorrow or thereafter, you will want to be candid in any application for privileges at another institution.

MEC Recommendation To Revoke Medical Privileges

On July 23, the Swedish chief of staff sent Dr. Eskridge a "Written Notice of Recommended Adverse Action." MEC recommended revoking Dr. Eskridge's privileges and membership at Swedish for the following reasons:

1. Your deliberate release of protected health information to an outside entity and your attempt to conceal this action, were in violation of policy and Medical Staff Rules and Regulations, including but not limited to rules and regulations concerning professional conduct and behavior.

2. Your failure to report any concerns through Swedish and Medical Staff internal channels, including established processes for quality review, was in violation of policy and Medical Staff Rules and Regulations.

3. Your history of behavior concerns shows a pattern of misconduct. You have previously received both education and corrective action for these concerns. Your pattern of misconduct has continued despite the previous education and corrective actions.

The Notice of Recommended Adverse Action informs Dr. Eskridge that "[b]ecause the MEC is recommending to the Swedish Health System Board of Trustees that your Medical Staff privileges and membership be revoked, you have the right to request a Review Hearing." The notice states Dr. Eskridge must request a review hearing in writing "within thirty (30) days of receipt of this letter" and "enclosed a copy of the Swedish Medical Staff Bylaws, Article XI: Disciplinary and Review Hearing."

9

Dr. Eskridge sent Fletcher the July 23 Notice of Recommended Adverse Action. At 8:09 a.m. on July 24, Fletcher sent an e-mail to Dr. Eskridge asking about the " 'history of behavior concerns' " and " 'pattern of misconduct' ":

> Item no. 3 is the most bothersome for me: "Your history of behavior concerns shows a pattern of misconduct. You have previously received both education and corrective actions for these concerns. Your pattern of misconduct has continued despite the previous education and corrective actions." What is that about? If you have any information about that, let me know so I can better assist you.

Fletcher testified that when he met with Dr. Eskridge, he was reluctant to discuss what had happened in the past but referred to the incident with Dr. Loh in 2013:

> I learned from [Dr. Eskridge] that there had been some incident years before that involved alcohol and a complaint by Dr. Loh about his — Dr. Eskridge's — behaviors. This led to some undefined action by Swedish, and what I understood is that it led also to a referral to the Washington Physicians Health Plan.
> I wasn't able to tease out a whole lot of information about that, other than Dr. Eskridge felt — I think his words were, "It was phony." But he didn't provide particulars.

In late July, Fletcher and Dr. Eskridge discussed whether to request a review hearing to contest revocation of his medical privileges. According to Dr. Eskridge, Fletcher told him to "not go ahead with the revocation hearing."

> In late July 2015, in a phone conversation, Mr. Fletcher communicated to me that it was his advice, counsel, and recommendation that I not go ahead with the revocation hearing. He said it would be expensive and that nothing would be accomplished. He told me that with my reputation I would have no trouble getting another job and that I could live off my investments and patents.

On July 30, Fletcher contacted Dr. Eskridge "regarding his decision not to appeal" the MEC recommendation. On July 31, Fletcher sent an e-mail to Dr. Eskridge confirming, "Per our conversation of yesterday, you don't want to bother appealing the recommendation of the MEC and you don't want me to do further work on this."

10

On August 10, Fletcher sent Dr. Eskridge a letter confirming his decision not to contest the MEC recommendation to revoke his medical privileges. Fletcher states a request for a hearing "must be made by August 20."

> I understand from our last conversation that you do not want me to seek an appeal of the decision of the [MEC] to revoke your privileges at Swedish. I will comply with that instruction and will not do anything further. For that reason, I believe that my engagement by you for legal services is now at an end.
> For your information, a notice for hearing must be made by August 20. Failure to submit a timely notice will be grounds to deny you a hearing.

Dr. Eskridge did not request a hearing.

Revocation of Medical Privileges

On November 5, the Swedish chief medical officer informed Dr. Eskridge that on October 28, 2015, the Swedish Health System Board of Trustees affirmed the MEC recommendation to revoke his medical staff privileges and membership. The letter states:

> Please be informed that since this final action is considered an adverse action, the Swedish Medical Staff is required to report this adverse action to the Washington State Medical Quality Assurance Commission and the National Practitioner Databank.

On November 12, Dr. Eskridge's "medical staff privileges and membership were terminated." Swedish reported the revocation of medical privileges to MQAC.

MQAC Investigation

In December, MQAC opened an investigation into the decision of Swedish to revoke Dr. Eskridge's medical provisions. Dr. Eskridge retained attorney Gerald Tarutis to represent him.

On March 8, 2016, Tarutis sent a letter to MQAC and a lengthy letter from Dr. Eskridge. Citing HIPAA regulations 45 C.F.R. §§ 164.520 through .526, Tarutis argued Dr. Eskridge did not violate HIPAA. Tarutis asserted HIPAA allows a physician to disclose protected health information without the patient's consent or authorization to a public health authority like Madigan, "provided the agency is legally authorized to collect and receive the disclosed information and the disclosure is for 'public health purposes,' " such as "public health surveillance, investigations, and interventions."

On April 6, MQAC sent a letter to Tarutis. The letter does not address HIPAA or the HIPAA defense. The letter states MQAC "closed this case." The letter states only that Dr. Eskridge "may have avoided this situation by reporting his concerns to [MQAC], instead of the Office of Inspector General directly," and "the panel acknowledges the Respondent was attempting to bring his significant concerns regarding the standard of care provided to patients to the attention of regulatory authorities."

Legal Malpractice Lawsuit

On March 7, 2017, Dr. Eskridge filed a legal malpractice lawsuit against Fletcher and Stokes Lawrence. Dr. Eskridge alleged Fletcher's legal representation fell below the standard of care and was the proximate cause of the decision of Swedish to revoke his privileges and membership. Dr. Eskridge alleged Fletcher knew or should have known that he had a defense to the alleged HIPAA violation. Fletcher filed an answer denying the allegations.

Summary Judgment Dismissal

Fletcher filed a motion for summary judgment dismissal. Fletcher asserted Dr. Eskridge could not prove proximate cause. Fletcher argued that if Dr. Eskridge had

challenged the revocation of his medical privileges, he would not have prevailed in the MEC hearing. Fletcher asserted Dr. Eskridge could not meet the burden to prove by clear and convincing evidence that the reasons to revoke his medical privileges were arbitrary, capricious, or unreasonable. Fletcher argued the opinions of Dr. Eskridge's experts on the standard of care were irrelevant and the expert opinions of John Christiansen and Tarutis about whether Dr. Eskridge would have prevailed were speculative. Fletcher also argued Dr. Eskridge could still pursue a wrongful termination claim against Swedish.

In response, Dr. Eskridge primarily relied on the declaration of Tarutis on the element of proximate cause. Tarutis states the determination by MQAC "is clear, cogent and convincing evidence that Dr. Eskridge's actions were well supported by HIPAA regulations and that he could have prevailed on this ground had the matter proceeded to a hearing before Swedish regarding his privileges." Tarutis also asserts that by requesting a hearing, Fletcher could have obtained discovery of additional facts and "presenting a positive defense could have created a different atmosphere resulting in a settlement of the issue."

The court granted summary judgment and entered an order dismissing the lawsuit.

Appeal of Summary Judgment Dismissal

Dr. Eskridge contends material issues of fact preclude granting summary judgment on proximate cause. We review summary judgment de novo. Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admission demonstrate the absence of any

genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002).

When the defendant files a motion for summary judgment showing the " 'absence of evidence to support the [plaintiff]'s case,' " the burden shifts to the plaintiff to set forth specific facts showing a genuine issue of material fact for trial. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Allegations or conclusory statements of fact unsupported by evidence are not sufficient to establish a genuine issue of material fact. Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989); Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 169, 273 P.3d 965 (2012). The nonmoving party cannot rely on "speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Bare assertions that a genuine material issue exists cannot defeat a motion for summary judgment. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 140, 331 P.3d 40 (2014); Griswold v. Kilpatrick, 107 Wn. App. 757, 763, 27 P.3d 246 (2001). A party must present more than "[u]ltimate facts" or conclusory statements. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017).

If the plaintiff " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

14

proof at trial,' " summary judgment is proper. Young, 112 Wn.2d at 225 (quoting Celotex, 477 U.S. at 322). Because Dr. Eskridge must meet the burden of showing by clear and convincing evidence that the recommendation of MEC was arbitrary or unreasonable, we incorporate that standard of proof in our assessment of the evidence on summary judgment. Portmann v. Herard, 2 Wn. App. 2d 452, 462-63, 409 P.3d 1199 (2018).

To establish a claim for legal malpractice, the plaintiff must prove (1) the existence of an attorney-client relationship that gives rise to a duty of care to the client, (2) an act or omission by the attorney that breaches the duty of care, (3) damage to the client, and (4) proximate cause between the attorney's breach of the duty and the damages incurred. Hizey v. Carpenter, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992).

Fletcher's motion for summary judgment assumed breach of the standard of care and addressed only proximate cause. Fletcher argued Dr. Eskridge could not prove by clear and convincing evidence that the recommendation to revoke his medical privileges was arbitrary or unreasonable.

The "cause in fact" and "but for" test applies to proof of causation in a legal malpractice case. Daugert v. Pappas, 104 Wn.2d 254, 260, 704 P.2d 600 (1985). A plaintiff in a legal malpractice case must prove that but for the negligence of the attorney, the plaintiff probably would have prevailed in the underlying proceeding. Daugert, 104 Wn.2d at 263; Schmidt v. Coogan, 162 Wn.2d 488, 492, 173 P.3d 273 (2007). A court can decide proximate cause as a matter of law only when reasonable minds could reach but one conclusion. SentinelC3, 181 Wn.2d at 140; Kim v. Budget

15

Rent A Car Sys., Inc., 143 Wn.2d 190, 203, 15 P.3d 1283 (2001); VersusLaw, Inc. v. Stoel Rives, LLP, 127 Wn. App. 309, 328, 111 P.3d 866 (2005).

Dr. Eskridge contends expert testimony shows the legal advice of Fletcher was the proximate cause of revocation of his privileges. Dr. Eskridge cites the MQAC decision to argue there is clear and convincing evidence that he would have prevailed at the MEC hearing and Swedish would not have revoked his medical privileges. Dr. Eskridge relies primarily on the declaration of his expert Tarutis. Tarutis asserts the MQAC decision not to pursue disciplinary action "is clear, cogent and convincing evidence that . . . [Dr. Eskridge] could have prevailed . . . had the matter proceeded to a hearing before Swedish."[7] For the reasons set forth below, we conclude Dr. Eskridge has not raised a genuine issue of material fact that he probably would have prevailed in the revocation hearing.

First, allocation of the burden of proof in a medical disciplinary proceeding is markedly different from the revocation hearing governed by the Swedish bylaws. In a medical disciplinary proceeding, MQAC has the burden of proving allegations against a doctor by clear and convincing evidence. Nguyen v. Wash. Dep't of Health Med. Quality Assur. Comm'n, 144 Wn.2d 516, 529, 29 P.3d 689 (2001). By contrast, in a Swedish revocation hearing, Dr. Eskridge had the "burden of proving by clear and convincing evidence" that the MEC recommendation to revoke his privileges "should not be sustained because it lacks factual basis or the conclusions drawn from the facts are arbitrary, capricious, or unreasonable." The declaration of Tarutis does not address

---

[7] Below, Dr. Eskridge also submitted declarations from expert witness Christensen and Mark Fucile. Christiansen does not state that Dr. Eskridge probably would have prevailed in an MEC hearing. Christiansen states only that "there were available internal processes available by Swedish's own by-laws and rules giving Dr. Eskridge the opportunity to avoid termination." Fucile addressed only the standard of care.

how Dr. Eskridge would have been able to meet the high burden of proof in an MEC revocation hearing.

Second, the scope of the evidence presented at the MEC hearing on the recommendation to revoke medical privileges would have been far broader than the evidence Dr. Eskridge presented to MQAC. Tarutis addressed only HIPAA in the letter to MQAC. HIPAA generally limits use of protected health information to treatment, payment, or health care operations. 45 C.F.R. § 164.502. Tarutis focused on certain HIPAA provisions that allow disclosure of protected health information without patient consent or notification to argue there was no HIPAA violation. To the extent Tarutis addresses how Dr. Eskridge obtained this patient information, Tarutis states only that Dr. Eskridge "personally witnessed inappropriate care" or "received reports from other health[ ]care providers who have witnessed similar inappropriate care." However, Dr. Eskridge admitted he obtained protected health care information of the patients identified in his letter to Madigan by electronically accessing and reviewing the medical records of five patients with whom he had no treatment relationship and from whom he had no consent to access their confidential medical records. Yet neither Tarutis nor Dr. Eskridge address the unauthorized access of protected health information of individuals who were not his patients or the allegation that his "history of behavior concerns shows a pattern of misconduct."[8] The undisputed record shows that Dr. Eskridge violated the Swedish Information Confidentiality Agreement; the policy on Integrity, Compliance, Privacy and Security; and the Swedish rules and regulations that expressly prohibit a

---

[8] Christiansen testified that he did not consider Dr. Eskridge's alleged "pattern of misconduct" in forming his opinion. In his declaration, Christiansen states that any " 'previous misconduct' " was "never identified in any record available to me." In his deposition, Christiansen similarly admitted that he formed his opinion "without knowing anything about any previous disciplinary issues."

doctor from accessing the protected health information of patients with whom that doctor has no treatment relationship. The evidence of accessing patient medical records is a clear violation of the Information Confidentiality Agreement Dr. Eskridge signed in 2012 that would have been presented at the Swedish hearing. The 2012 Information Confidentiality Agreement unequivocally states Dr. Eskridge agrees to "only access . . . the minimum confidential information as authorized to do my job" and "not in any way access . . . any confidential information except as properly and clearly authorized within the scope of my job and in accordance with all applicable Swedish policies and procedures." The Swedish corrective action policy for privacy violations identifies "[l]ooking at or accessing confidential information (including PHI/ePHI[9]) for an unauthorized purpose" as a violation "that may result in corrective actions."

The undisputed record supports finding Dr. Eskridge violated Swedish rules and regulations governing professional conduct and behavior by attempting to conceal his identity when he contacted Madigan. The Swedish rules and regulations require doctors to report standard of care concerns. The record also shows Dr. Eskridge did not report concerns about substandard care "through Swedish and Medical Staff internal channels." The undisputed record also supports finding a "pattern of misconduct" dating back over a period of years and continuing despite previous corrective action efforts.

According to Tarutis, if Fletcher had requested a hearing, he could have obtained discovery on the allegation of a pattern of misconduct and by "presenting a positive defense could have created a different atmosphere resulting in a settlement of the issue." Speculative and conclusory opinions cannot create a genuine issue of material

---

[9] Electronic protected health information.

18

fact on the element of proximate cause. <u>Daugert</u>, 104 Wn.2d at 260 ("The 'but for' test requires a plaintiff to establish that the act complained of probably caused the subsequent disability. . . . Plaintiff's case must be based on more than just speculation and conjecture."); <u>Griswold</u>, 107 Wn. App. at 763 (expert witness' conclusory opinion that the claim would have settled not sufficient to raise a genuine issue of material fact on the element of proximate "but for" causation).

We conclude Dr. Eskridge could not show by clear and convincing evidence that but for the alleged breach of the standard of care, the recommendation to revoke his medical privileges lacked a factual basis or the conclusions drawn from the facts were arbitrary, capricious, or unreasonable. We affirm summary judgment dismissal of the lawsuit.

WE CONCUR: