In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 21-3015

KENNETH MARTINDALE, Individually and as Personal Representative of the Estate of JODY MARTINDALE, Deceased,

*Plaintiff-Appellant,*

*v.*

INDIANA UNIVERSITY HEALTH BLOOMINGTON, INC., d/b/a IU HEALTH BLOOMINGTON HOSPITAL,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-00513 — **Richard L. Young**, *Judge.*

---

ARGUED MAY 19, 2022 — DECIDED JULY 6, 2022

---

Before FLAUM, EASTERBROOK, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Early one morning in January 2017, Jody Martindale arrived at the emergency room at Indiana University Health Bloomington Hospital with severe abdominal pain. IUHB doctors promptly determined she needed emergency surgery to remove a dying portion of her intestine. But because they believed (incorrectly, it would turn

out) that the problem stemmed from an earlier gastric bypass surgery, they transferred her to a different facility to be operated on by the bariatric surgeon who had performed the bypass. Tragically, Jody Martindale died two days later.

Martindale's husband sued IUHB, alleging that its failure to operate on Jody violated its obligations under the federal Emergency Medical Treatment and Labor Act. But that Act serves a very narrow set of purposes, and IUHB complied with its requirements. So we are left to affirm the entry of summary judgment for IUHB.

## I

### A

Jody Martindale entered IUHB's emergency room in Bloomington, Indiana at 7:08 a.m. on January 16, 2017. A few minutes later, at 7:21 a.m., Dr. Francis Karle examined her and ordered IV fluids, pain medication, and lab tests to further assess Jody's abdominal condition. Results of those tests came back abnormal, leading Dr. Karle to order a CT scan at 8:18 a.m.

The CT scan, performed at 9:31 a.m., revealed evidence that "may indicate active mesenteric ischemia involving the small intestine in the central abdomen." In plain English, this meant that a portion of Jody's intestine was dying from lack of blood flow. The CT report Dr. Karle received indicated that the potential ischemia may have had something to do with a prior gastric bypass surgery:

> There is one segment of the small intestine that is much more distended … and this is associated with suture material, possibly indicating

> internal hernia or volvulus of a segment in-
> volved in gastric bypass anastomosis. … Patient
> has evidence of a small recurrent sliding hiatal
> hernia which contains some of the suture mate-
> rial closely associated with the stomach, from
> the gastric bypass surgery.

The report concluded that a "[g]eneral surgery consulta-tion is recommended to consider exploratory laparotomy, given the possibility of mesenteric ischemia." An exploratory laparotomy is a procedure involving opening up the patient's abdomen to allow doctors to more closely examine the inter-nal organs and determine next steps.

At 9:47 a.m., after receiving the CT results, Dr. Karle called IUHB's on-call general surgeon, Dr. Terrence Greene. The two discussed the "full details of [Jody's] case," including the fact that she "had undergone a gastric bypass operation around 10 years prior" and that the ischemia might be related to that prior procedure. Dr. Greene told Dr. Karle that he could not perform the laparotomy because he "does not touch gastric bypass patients." This was so, Dr. Greene later testi-fied, because he "had no training in bariatric surgery, [had] never performed a bariatric procedure, [and had] never even seen a bariatric surgery." He therefore did not "feel like [he] ha[d] the training and the expertise" required to operate safely on Jody. He recommended instead that Dr. Karle con-tact the surgeon who performed the original bypass.

Half an hour later, at 10:17 a.m., Dr. Karle spoke over the phone to that surgeon, Dr. RoseMarie Jones at Community Health Bariatric Center in Indianapolis. He explained the sit-uation and asked Dr. Jones whether she was available to op-erate on Jody. Dr. Jones agreed to accept the transfer,

recommending that IUHB send Jody via helicopter so that she could receive treatment as soon as possible. Poor weather made air transport impossible, however, so Dr. Karle arranged for transportation in an ambulance with advanced life support capabilities. Dr. Karle ordered the ambulance for noon, but it did not depart until 12:28 p.m.

Jody arrived at Community Health at 1:26 p.m., where Dr. Jones then performed the emergency laparotomy. The procedure confirmed that parts of Jody's intestines were indeed ischemic, so Dr. Jones "performed a small bowel resection" to remove the dying portions. During the surgery, Dr. Jones found "absolutely no sign of any bariatric etiology for Mrs. Martindale's ischemia," revealing that IUHB had been mistaken in its belief that Jody's condition stemmed from prior gastric bypass surgery. Dr. Greene later testified that, had he known at the time that the ischemia was unrelated to the bypass, he "probably" could have operated on Jody himself at IUHB.

After the surgery, Jody experienced sepsis and multiple organ failure. Dr. Jones concluded that "[i]t is hard to know whether quicker treatment would have had a different result, but the further delay due to transport certainly did not help." Jody passed away two days later. She was just 50 years old.

B

Jody's husband Kenneth Martindale sued IUHB, invoking the federal Emergency Medical Treatment and Labor Act, which practitioners often refer to as EMTALA but which we will call the Treatment Act. As relevant to this appeal, Martindale asserted that IUHB failed to satisfy its statutory obligation to "stabilize" Jody when it decided to transfer her to

Dr. Jones in Indianapolis without first performing the laparotomy and removing the ischemic portions of her intestine. See 42 U.S.C. § 1395dd(b)(1)(A).

But the district court never answered the question whether IUHB had successfully stabilized Jody within the meaning of the Act. It instead entered summary judgment for IUHB on alternative grounds. Even "assuming she was *not* stabilized" at the time of transfer, the district court explained, no reasonable jury could find that IUHB had not satisfied the Treatment Act's provisions expressly permitting it to transfer her *prior to* stabilization. See *id.* § 1395dd(b)(1)(B), (c).

Martindale now appeals.

## II

Before turning to the substance of Martindale's claims, we begin by setting out the statutory scheme on which they depend.

Congress passed the Treatment Act in 1986 with a specific problem in mind. The Act sought to eliminate "patient 'dumping,'" a practice by which "hospitals would not provide the same treatment to uninsured patients as to paying patients, either by refusing care to the uninsured patients or by transferring them to other facilities." *Beller v. Health & Hosp. Corp. of Marion County*, 703 F.3d 388, 390 (7th Cir. 2012). To that end, the enactment imposes a set of obligations with which hospitals accepting federal funds through Medicare must comply when faced with patients seeking emergency care.

Hospitals that fail to satisfy their statutory obligations may owe civil penalties to the government or compensatory damages to patients. See 42 U.S.C. § 1395dd(d)(1)–(2).

Crucially, though, federal courts are unanimous that the Treatment Act "is not a malpractice statute" and so "cannot be used to challenge the quality of medical care." *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1025 (7th Cir. 2021) (joining seven other circuits in reaching that conclusion). Instead, patients can collect only those damages that flow directly from violations of the Act's requirements. See 42 U.S.C. § 1395dd(d)(2)(A).

Foremost among the obligations the Act imposes is its screening requirement: hospitals must examine each person who arrives at an emergency room and determine whether they have an "emergency medical condition." *Id.* § 1395dd(a). An "emergency medical condition" is one characterized by "acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to" jeopardize the individual's health or impair her bodily functions or organs. *Id.* § 1395dd(e)(1)(A)(i)–(iii). If the screening turns up no such condition, the hospital's obligations under the Treatment Act come to an end.

Hospitals must go one step further, though, for those patients they determine do present with an emergency medical condition. In those circumstances, subsection (b)(1) requires the hospital to provide either:

> (A)  within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B)  for transfer of the individual to another medical facility in accordance with subsection (c).

*Id.* § 1395dd(b)(1)(A)–(B). Hospitals, in short, must "either provide further treatment or transfer [the patient] in accordance with certain parameters." *Nartey*, 2 F.4th at 1025; see also *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 893 (7th Cir. 2003).

It is those parameters governing transfer, set out in § 1395dd(c), that lie at the heart of this case. That provision begins by setting out the general rule that, if a patient suffers from "an emergency medical condition which has not been stabilized, … the hospital *may not transfer the individual*" to another facility. 42 U.S.C. § 1395dd(c)(1) (emphasis added). And a condition is considered "stabilized," the Act goes on to explain, if "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(B).

But despite its clear preference for stabilization, the Treatment Act expressly authorizes transfer *prior to stabilization* if two sets of additional conditions are satisfied. *First*, § 1395dd(c)(1)(A) permits pre-stabilization transfer if either the patient requests transfer in writing "after being informed of the hospital's obligations under [the Act] and of the risk of transfer," *id.* § 1395dd(c)(1)(A)(i), or, alternatively, a physician (or other qualified person) certifies in writing that, "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual … from effecting the transfer." *Id.* § 1395dd(c)(1)(A)(ii)–(iii).

*Second*, even if one of those predicate conditions is satisfied, the Treatment Act authorizes pre-stabilization transfer only so long as it is "appropriate," *id.* § 1395dd(c)(1)(B), a term

the statute attaches to transfers satisfying, yes, four further conditions. See *id.* § 1395dd(c)(2)(A)–(D). Three of these final conditions are easy enough to understand: the transferring hospital must locate a transferee with "available space and qualified personnel" that "has agreed to accept transfer" and then treat the patient; must provide the transferee with "all medical records" that are "related to the emergency condition"; and must effectuate the transfer through "qualified personnel and transportation equipment." *Id.* § 1395dd(c)(2)(B)–(D). The final prerequisite of "appropriate" pre-stabilization transfer, though—and the one most relevant to this case—is less self-explanatory: the transferring hospital must "provide[ ] the medical treatment within its capacity which minimizes the risks to the individual's health." *Id.* § 1395dd(c)(2)(A). Neither the Treatment Act itself nor its implementing regulations, see 42 C.F.R. § 489.24, provide further direction on the meaning of this final requirement.

### III

We begin with the common points of agreement between the parties. All agree that IUHB satisfied the Treatment Act's screening requirement when Dr. Karle examined Jody Martindale shortly after she arrived at the emergency room. See 42 U.S.C. § 1395dd(a). Nor is there any doubt that the ischemic bowel the CT scan revealed was an "emergency medical condition" triggering IUHB's additional obligation to "provide further treatment or transfer [Jody] in accordance with certain parameters." *Nartey*, 2 F.4th at 1025 (citing 42 U.S.C. § 1395dd(b)(1)). Finally, it is clear that IUHB in fact chose to transfer Jody rather than provide further treatment.

The narrow disagreement, then, is whether that transfer complied with the Treatment Act. On appeal, Martindale

renews his contention that IUHB violated § 1395dd(c) by fail-
ing to stabilize Jody prior to transferring her. In his view, the
only thing that could have stabilized Jody was Dr. Greene (or
another IUHB surgeon) performing surgery in Bloomington
to remove the ischemic portions of her intestine. And so, be-
cause IUHB instead left it to Dr. Jones at Community Health
in Indianapolis to perform that stabilizing surgery, Martin-
dale believes a reasonable jury could find a violation of the
Treatment Act.

Martindale's focus on the Treatment Act's stabilization re-
quirement does not join issue with the basis for the district
court's decision—that the Treatment Act permitted IUHB to
transfer Jody *without* first stabilizing her, and that IUHB com-
plied with the requirements for doing so. But we are reluctant
to decide the case based on waiver, especially since, as will
become clear, Martindale's brief can be read to make a more
structural argument about the meaning of the Treatment
Act—that a hospital may never transfer a patient prior to sta-
bilization on facts like the ones in this case.

That position is untenable. The Treatment Act expressly
authorizes pre-stabilization transfer where one of two trigger-
ing conditions is satisfied and the transfer is "appropriate."
See 42 U.S.C. § 1395dd(c)(1)(A)–(B). No reasonable jury could
conclude that IUHB did not satisfy both requirements here.
Like the district court, then, we do not reach the question
whether IUHB stabilized Jody within the meaning of the
Treatment Act, because the Act expressly permitted her trans-
fer even absent stabilization.

A

For starters, Martindale has never argued that IUHB failed to satisfy one of the two predicates for pre-stabilization transfer—a written request by the patient or a certification signed by a doctor. See *id.* § 1395dd(c)(1)(A)(i)–(iii).

Here, IUHB took the latter path: at 10:45 a.m. on the morning of January 16, following his phone conversation with Dr. Jones at Community Health, Dr. Karle completed and signed a form titled "Transfer Certification to Another Facility." In that form Dr. Karle certified—in language exactly mirroring the statutory text of § 1395dd(c)(1)(A)(ii)—that,

> [b]ased upon the information available to [him] at the time of transfer, … the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to [Jody] … from undertaking the transfer.

The information available to Dr. Karle at the time—the results of the CT scan—seemed to indicate that Jody's ischemia was related to her history of gastric bypass surgery. On that understanding, the on-call surgeon Dr. Greene believed he could not safely operate on Jody. And for that reason, Dr. Karle's certification indicated that he saw the benefits of "[e]xploratory laparotomy by [Jody's bariatric] surgeon," Dr. Jones, as outweighing the risks of transfer to Dr. Jones's facility, of which the form listed none beyond ordinary "[t]ransportation [r]isk."

Martindale does not suggest that Dr. Karle completed this certification in bad faith. See 42 U.S.C. § 1395dd(d)(1)(B)(i) (providing for civil penalties of up to $50,000 for a physician

who "signs a certification under subsection (c)(1)(A) … if the physician knew or should have known that the benefits did not outweigh the risks"). And absent some evidence corroborating such an allegation, the Treatment Act does not permit us to second guess Dr. Karle's decision. A certifying physician "need not be correct in making a certification decision; the statute only requires a signed statement attesting to an actual assessment and weighing of the medical risks and benefits of transfer." *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1371 (5th Cir. 1991). There is no jury question on this point.

## B

From there the question becomes whether Jody's transfer to Community Health was "appropriate" within the meaning of § 1395dd(c)(2).

There is no dispute about three of the four requirements of appropriate transfer. Martindale does not argue on appeal that Community Health lacked the resources to treat Jody or had not accepted the transfer, see 42 U.S.C. § 1395dd(c)(2)(B); that IUHB failed to provide Community Health with the required paperwork, see *id.* § 1395dd(c)(2)(C); or that the transfer was not "effected through qualified personnel and transportation equipment," *id.* § 1395dd(c)(2)(D).

That leaves the parties to disagree about just one statutory requirement: whether IUHB provided Jody with "the medical treatment within its capacity which minimizes the risks to [her] health." *Id.* § 1395dd(c)(2)(A). Martindale urges a broad reading of this language. In his view, evidence presented at summary judgment shows that it was "within [IUHB's] capacity" to perform the laparotomy and resection required to

remove the dying portion of Jody's intestine, and that only this surgery could "minimize[ ] the risks to [Jody's] health." *Id.* Accordingly, he argues, because IUHB transferred Jody to Community Health without performing these procedures in Bloomington, the transfer was not "appropriate" within the meaning of the Treatment Act.

Recognize, though, what adopting Martindale's reasoning would mean. The laparotomy and resection procedures Martindale now argues were required to "minimize the risks" under § 1395dd(c)(2)(A) are the very same surgeries he says were needed to "stabilize" Jody under § 1395dd(c)(1) and (e)(3)(B). On Martindale's reading, then, a hospital may not make use of subsection (c)'s pre-stabilization transfer procedures when the necessary stabilization treatment is within the hospital's capacity. Or put another way, when the evidence shows the hospital could have stabilized the patient, pre-stabilization transfer could never be deemed "appropriate." *Id.* § 1395dd(c)(1)(B).

That cannot be. By the express terms of the Treatment Act, we only reach the question whether transfer is appropriate once the patient has requested transfer or the treating physician has certified that the benefits of transfer *prior to stabilization* "outweigh the increased risks to the individual … from effecting the transfer." *Id.* § 1395dd(c)(1)(A)(ii). In that context, it is clear that subsection (c)(2)(A) requires the hospital to minimize only the risks *of transfer*—the same risks the Act asks the treating physician to balance when deciding whether to sign the transfer certification.

We can put the same observation another way. Dr. Karle signed the certification accompanying the transfer decision on the view that no available surgeon at IUHB could safely

operate on Jody. Martindale points to Dr. Jones's testimony to argue that this opinion was ultimately mistaken—that IUHB in fact *could have* stabilized Jody. By Martindale's telling, therefore, the Treatment Act's minimize-the-risks language in § 1395dd(c)(2)(A) required IUHB to perform the very surgery that Dr. Karle had just certified the hospital could not safely perform. That reading, which depends entirely on the hindsight offered by Dr. Jones's assessment, cannot be squared with the text of the statute, which requires not that the transfer turn out to be the best medical choice, but only that a physician believe the decision warranted "based upon the information available *at the time*." *Id.* § 1395dd(c)(1)(A)(ii) (emphasis added); see *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 19 (1st Cir. 2011) (rejecting as "untenable" the argument that § 1395dd(c)(2)(A) requires a hospital to "deliver the feasible specific treatment that is best, whatever it may be").

That reading is likewise incompatible with the Treatment Act's narrow purpose as an anti-dumping law rather than a federal cause of action for medical malpractice. See *Beller*, 703 F.3d at 390; *Nartey*, 2 F.4th at 1025. Cases in which a physician—like Dr. Karle here—has, in good faith, signed a certification under subsection (c)(1)(A), are not cases in which the hospital is engaged in patient dumping. They are instead situations in which the treating physician has undertaken "an actual assessment and weighing of the medical risks and benefits of transfer" and determined that transfer is in the patient's best interest. *Burditt*, 934 F.2d at 1371. To the extent Dr. Karle's views about IUHB's ability to safely operate on Jody were unreasonable or fell below the relevant standard of care—and Martindale has submitted the testimony of a purported expert, Dr. Martin Schreiber, to support this

proposition—that claim sounds only in medical malpractice. See *Ramos-Cruz*, 642 F.3d at 19.

So, too, is a state-law malpractice claim the proper vehicle for addressing a separate contention made by Martindale in passing: that Dr. Greene independently violated the Treatment Act by failing to appear in person to examine Jody. To be sure, an on-call physician who "fails or refuses to appear within a reasonable period of time" to operate on a patient may open himself up to Treatment Act liability. 42 U.S.C. § 1395dd(d)(1)(C). But the record here is clear that Dr. Greene promptly answered Dr. Karle's phone call, discussed Jody's case with him, reviewed the CT scan results, and determined he was unable to stabilize Jody's condition. If Dr. Karle saw this conduct as constituting a failure or refusal to appear, the Treatment Act would have required him to notify Community Health of that fact. See *id.* § 1395dd(c)(2)(C). But Dr. Karle left blank that portion of the transfer certification form, indicating he did not believe Dr. Greene to be shirking his statutory duties. And there is no evidence permitting a jury to conclude otherwise. Instead, here again, the reasonableness of Dr. Greene's conduct is a question for state malpractice law only.

Back in the realm of federal law, there remain difficult questions about what precisely it means for a hospital to "minimize[ ] the risks" of pre-stabilization transfer within the meaning of § 1395dd(c)(2)(A). Recall that neither the Treatment Act nor the applicable regulations provide an express definition of the phrase. Other circuits have read the provision to impose only a de minimis requirement that the hospital comply with its own standard operating procedures regarding transfer. See *Ramos-Cruz*, 642 F.3d at 19; *Ingram v.*

*Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 552 (10th Cir. 2000). But it is not self-evident—at least without briefing and argument on the question—that any and all standard operating procedures would fit the bill. In other contexts, for example, minimize really means minimize: "to reduce to the smallest amount, extent, or degree reasonably possible." 40 C.F.R. § 125.83 (defining "minimize" for purposes of § 316(b) of the Clean Water Act, 33 U.S.C. § 1326(b)).

We can leave for another day, however, the task of discerning the precise contours of the Treatment Act's minimize-the-risks requirement. We have already rejected Martindale's sole argument about the phrase's meaning: that § 1395dd(c)(2)(A) requires stabilization if the facts show it is possible, regardless of a physician's certification to the contrary. Beyond that, Martindale makes no claim—and there is no indication in the summary judgment record—that IUHB carried out the transfer itself in an unsafe manner. Accordingly, he has not presented evidence permitting a reasonable jury to conclude that IUHB failed to provide medical care within its capacity to minimize the risks of Jody's transfer to Community Health. The transfer was thus "appropriate," 42 U.S.C. § 1395dd(c)(1)(B), and summary judgment for the hospital was proper.

\*       \*       \*

The facts of this case are tragic. But we are left to apply the Treatment Act as Congress enacted it. If Martindale has a claim against IUHB, it is one under state rather than federal law. We express no views on the merits of such a claim.

For these reasons, the judgment is AFFIRMED.