## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DR. HUNG DANG, M.D., a single person, | No. 83002-3-I |
| Appellant, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| FLOYD, PFLUEGER & RINGER, PS, a Washington professional services corporation; and REBECCA SUE RINGER, an individual, | |
| Respondents. | |

BIRK, J. — Hung Dang, MD, brought a legal negligence claim against Floyd, Pflueger & Ringer PS and Rebecca Ringer (together FPR). Ringer represented Dr. Dang in a hearing before the Washington Medical Quality Assurance Commission (MQAC).[1] Dr. Dang asserts that decisions to not call certain witnesses, not offer certain exhibits, and not depose two witnesses, amounted to a breach of the standard of care and proximately caused damage to Dr. Dang. We conclude there is not a reasonable inference that had the omitted evidence been admitted Dr. Dang would have received a more favorable outcome. As a result, the trial court correctly granted summary judgment to FPR. We also conclude the

---

[1] MQAC has since been renamed to Washington Medical Commission, but for consistency with our previous opinion affirming the MQAC findings in Dr. Dang's matter, we continue to refer to the commission as MQAC. See RCW 18.71.015, amended by Laws of 2019, Ch. 55, § 3(1).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

trial court properly denied Dr. Dang's CR 56(f) motion to continue the summary judgment hearing. We affirm.

I

A

The underlying facts are set forth in further detail in our opinion in Hung Dang v. Department of Health, in which we upheld the discipline that MQAC imposed on Dr. Dang. 10 Wn. App. 2d 650, 450 P.3d 1189 (2019), review denied, 195 Wn.2d 1004, 458 P.3d 781, cert. denied, 141 S. Ct. 371, 208 L. Ed. 2d 94 (2020). We summarize the facts here.

Dr. Dang is an otolaryngologist, specializing in the treatment of the ear, nose, and throat (ENT). Dr. Dang worked at Group Health Cooperative. As a condition of his employment with Group Health, Dr. Dang maintained staff privileges and worked as an on call emergency ENT specialist at St. Joseph Medical Center in Tacoma for all Group Health patients. St. Joseph is one of several hospitals in the Franciscan Health System and is a level II trauma center.

Dr. Dang and his fellow Group Health ENT specialist colleagues (together "Group Health ENT specialists") took "community call" for St. Joseph patients, covering the general St. Joseph population including those not covered by Group Health. "Community call" means that if a patient presents to an emergency department (ED) and specialty services are needed, a request can be made on behalf of the patient for a specialty physician to come in to evaluate and care for that patient. Active medical staff members are generally expected to take community call.

The Group Health ENT specialists taking community call at St. Joseph also received consultation calls from EDs at Franciscan's other affiliated hospitals, such as St. Francis Hospital in Federal Way and St. Clare Hospital in Lakewood. ED physicians at the other affiliated hospitals were provided a call schedule for on call specialists who consulted on Group Health patients, and another call schedule for on call specialists who consulted for Franciscan patients. The Group Health ENT specialists received calls because the ED physicians at the affiliated Franciscan hospitals possessed the ENT specialist rotation call schedule published by Franciscan based on the specialists holding privileges at St. Joseph. This led to the Group Health ENT specialists receiving consultation requests not only for Group Health covered patients, but also for Franciscan's other patient population.

Burdened with the additional caseload, the Group Health ENT specialists objected to accepting consultation calls from Franciscan-affiliated hospitals other than St. Joseph, reasoning that the Franciscan medical staff bylaws did not require them to take such calls. ED physicians from the Franciscan-affiliated hospitals argued Dr. Dang and his colleagues were responsible for the consultation calls and failing to comply might be considered a violation of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.

EMTALA requires hospitals to treat patients who need emergency medical care, regardless of their ability to pay. 42 U.S.C. § 1395dd; Jackson v. E. Bay Hosp., 246 F.3d 1248, 1254 (9th Cir. 2001). EMTALA was based in part on a concern by Congress that hospitals were "dumping" patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients,

3

or by transferring the patients to other hospitals before the patients were stabilized. Jackson, 246 F.3d at 1254. Under EMTALA, a hospital must provide appropriate emergency medical care to stabilize the patient's medical condition or transfer the patient to another medical facility provided certain requirements are satisfied. 42 U.S.C. § 1395dd(b), (c).

Tony Haftel, MD, the former Franciscan vice president of quality and associate chief medical officer, became involved in trying to resolve the community call issue. Kim Moore, MD, succeeded Dr. Haftel and also sought to resolve the issue. On October 5, 2011, Dr. Haftel e-mailed Dr. Dang and Dr. Moore to inform them that Franciscan made it clear to their ED physicians that the Group Health ENT specialists on community call were responsible for St. Joseph as the schedule stated. In an e-mail dated April 30, 2014, Dr. Moore acknowledged meeting with Craig Iriye, MD MHA, the medical center chief for Group Health's Tacoma Medical Center, to discuss the Group Health ENT specialists' concerns. Dr. Moore also suggested a screening checklist for the patient transfer center to use when getting a request to contact a Group Health ENT for a patient consultation.

The Group Health administration told the Group Health ENT specialists that they must comply with Franciscan's request that the Group Health ENT specialists manage the patients from the entire Franciscan system. Group Health reasoned that doing otherwise might be seen as an EMTALA violation, and Group Health wanted to maintain its partnership and cooperation with Franciscan.

No. 83002-3-I/5

B

On March 30, 2016, the Washington State Department of Health (DOH) filed a statement of charges against Dr. Dang, alleging violation of EMTALA and the Uniform Disciplinary Act (UDA), chapter 18.130 RCW. The UDA governs licensing and discipline of physicians. RCW 18.130.180 regulates unprofessional conduct. Among other things, it is unprofessional conduct for a licensed health professional to commit an act involving moral turpitude relating to the practice of the person's profession, or commit negligence, malpractice, or incompetence which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. RCW 18.130.180(1), (4). Additionally, it is unprofessional conduct for a licensed health professional to violate any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice. RCW 18.130.180(7).

The DOH statement of charges against Dr. Dang alleged violations of EMTALA and RCW 18.130.180(1), (4), and (7) with respect to patients "A," "B," and "C." According to the charges, generally, Dr. Dang violated EMTALA and the UDA by refusing to consult on three patients on the grounds that he was not on call for the Franciscan hospitals to which the patients first presented.

Dr. Dang retained attorney Rebecca Ringer and filed an answer to the statements of charges. MQAC proposed a settlement agreement which would have consisted of stipulated findings of fact, conclusions of law, and an agreed order, and which would have avoided a hearing on the charges. Dr. Dang rejected

5

the settlement offer. Ringer did not depose Dr. Moore in advance of the MQAC hearing. In the prehearing filings, Ringer did not list Dr. Haftel as a witness or identify as exhibits any of the e-mails in which Dr. Moore had acknowledged the existence of the Group Health ENT specialists' concerns about receiving consultation requests from Franciscan hospitals other than St. Joseph.

Ringer later testified that she did not call Dr. Haftel because she did not think he could provide any information needed for the time frame relevant to Dr. Dang's case. Ringer opted against deposing Dr. Moore because she viewed Dr. Moore's involvement as evident in the record and did not want deposition questioning to allow an adverse witness to become better prepared. Ringer preferred to avoid depositions because doing so would make it less likely the DOH would depose Dr. Dang, and therefore less likely that it would discover the e-mails concerning community call. Ringer did not offer the community call e-mails because she believed using them as evidence would lead the DOH to other evidence that she thought would do "more harm than good" and be "risky" and "dangerous" for Dr. Dang at the hearing. Ringer believed relying on the e-mails would have led the DOH to seek discovery of all related e-mails, beyond just those Dr. Dang believed supported the existence of the community call dispute.

C

The three day MQAC hearing began on January 30, 2017. On September 29, 2017, MQAC issued its 22 page findings of fact, conclusions of law, and final order. On December 20, 2017, MQAC issued amended findings of fact, conclusions of law, and final order. This court upheld the MQAC's amended

6

findings of fact, conclusions of law, and final order.  Hung Dang, 10 Wn. App. 2d at 675.

MQAC entered findings in regard to the three patients it had charged Dr. Dang with refusing to transfer or see.

1

MQAC found patient A was seen at St. Clare for facial swelling, an enlarged tongue with airway obstruction, and difficulty breathing and swallowing.  It found, based on patient A's medical history and current condition, the ED physician was concerned that patient A's condition could worsen and a specialist who could render a higher level of care was needed.  It found St. Clare did not have an ENT specialist on call.  And it found Dr. Dang was contacted to care for patient A, but he refused to accept patient A's transfer to St. Joseph.

Dr. Dang testified that in the handling of the call with the ED physician for patient A, Dr. Dang complied with EMTALA and the applicable standard of care.  Dr. Dang reasoned that based on the information he received from the St. Clare ED physician, patient A was not suffering from serious airway issues, and the ED physician should go through the transfer center to process patient A's transfer out of St. Clare.

MQAC found that Dr. Dang's conduct regarding patient A did not violate the standard of care or EMTALA.  It found that patient A was not transferred to St. Joseph and that Dr. Dang was not on call at St. Clare, so Dr. Dang had no duty to treat or accept the transfer of patient A.

7

2

MQAC found that patient B was seen at the St. Francis ED for a sore throat, difficulties with swallowing and breathing, and fluid collection consistent with tonsillar abscess. It found, based on patient B's physical examination and the computerized tomography scan results, the ED physician determined that it was necessary to transfer patient B to St. Joseph for further treatment and to consult with an ENT specialist. MQAC also found that Dr. Dang refused to discuss the case with the ED physician, admit patient B, or agree to a transfer.

Dr. Dang testified that he did not refuse to consult with the ED physician about patient B, but instead told the ED physician that he was driving so he would call back. Dr. Dang stated he wanted to use his computer to look at patient B's medical records and test results to determine whether transferring patient B to St. Joseph would be appropriate. Dr. Dang said when he returned the ED physician's call, patient B's abscess had been successfully drained.

For patient B, MQAC found no EMTALA violation, but found Dr. Dang's refusal to consult with the ED physician concerning the care of patient B was an act of moral turpitude that lowered the standing of the profession in the eyes of the public, in violation of RCW 18.130.180(1). Additionally, MQAC found Dr. Dang's refusal to consult with a fellow physician acting in good faith to help a patient created an unreasonable risk of harm to patient B. See RCW 18.130.180(4).

3

MQAC found that patient C was seen at the St. Clare ED for ear pain, a sore throat, and trouble swallowing. It found the treating staff suspected a

8

retropharyngeal abscess, which is described in the record as a "deep neck space infection[ ] that can pose an immediate life-threatening emergency with the potential for airway compromise." MQAC found the St. Clare ED physician spoke with Dr. Dang, who was the on call specialist at St. Joseph. It found Dr. Dang refused to consult on or accept a transfer of patient C, since he was not on call for St. Clare. And, MQAC found the St. Clare ED physician contacted Harborview Medical Center in Seattle, which did not have capacity to accept patient C, and then the St. Clare ED physician contacted Dr. Moore.

Dr. Moore testified that she approved the transfer of patient C from St. Clare's ED to St. Joseph's ED. Dr. Moore said Dr. Dang "refused to come in and see the patient." Dr. Moore called Dr. Dang and "asked him to go in and see the patient." According to Dr. Moore, Dr. Dang told her he "would not go in to see the patient because the patient had come from St. Clare." Dr. Moore testified that Dr. Dang did not give "any other reason why he would not or could not come in and see the patient."

Dr. Dang testified that he did not consult on patient C. Dr. Dang testified that he told Dr. Moore that he was "not physically capable" of treating patient C because of his recently having taken pain medication. Dr. Dang testified that in late February or early March 2014, he had had ankle surgery. Dr. Dang said that he fell and injured his heel and took a "hydrocodone and acetaminophen combination . . . pill" for the pain. Other than his testimony at the MQAC hearing, there is no evidence that Dr. Dang indicated his physical incapacity to see patient C contemporaneous with his conversation with Dr. Moore and refusal to see the

9

patient. Rather, the first evidence of Dr. Dang asserting that he was physically compromised was his testimony at the MQAC hearing, many months after patient C sought treatment. The MQAC hearing panel stated it was not persuaded by Dr. Dang's "after-the-fact justification."

For patient C, MQAC found that Dr. Dang violated EMTALA and RCW 18.130.180. MQAC noted that patient C was experiencing an emergency medical condition that had not been stabilized, and his transfer to St. Joseph was appropriate. Furthermore, even if the transfer was improper, MQAC concluded that Dr. Dang was "nonetheless obligated under EMTALA to appear and treat patient C once he was transferred to [St. Joseph]."

As a result of its findings on patients A, B, and C, MQAC ordered oversight of Dr. Dang's medical license for two years, monitoring requirements, and a $5,000 fine.

4

Ringer does not dispute that the existence of the community call dispute was important to providing an explanation for Dr. Dang's conduct with patients A, B, and C. When Ringer cross-examined Dr. Moore regarding the community call issue, Dr. Moore denied knowledge of the issue:

Q    [Y]ou were already familiar with the fact that there was ongoing discussion between the [Group Health] ENT specialists and the Franciscans about the issue of community call; correct?
A    No, I was not aware.
Q    Did you take over for Tony Haftel?
A    I did.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> Q    He didn't alert you to the fact that this has been a brewing issue, there is ongoing conversation and this needs to be addressed?
> A    No.
> Q    Were - you were never made aware of that in any regard?
> A    No.
> Q    How about until right now?
> A    Yes, before today I knew that it was an issue, but not back in 2012.
> Q    And I'm talking about 2014?
> A    2014.
> Q    So you were unaware that there was this issue between the ENT surgeons and the hospital about call?
> A    No.  I knew that the call structure was complicated, but I didn't know that there were issues.

After Dr. Moore denied knowledge of the community call issue, Ringer attempted to introduce the e-mails that Dr. Moore was copied on and replied to from October 6, 2011 and April 30, 2014, but the health law judge excluded them because they had not been disclosed earlier.  Ringer testified that her original concerns about relying on the community call e-mails no longer existed, because by that point there would not be additional discovery.  Ringer nevertheless did not believe the community call e-mails would strongly impeach Dr. Moore about her ability to recall discussions about the community call issue, and therefore did not see those e-mails as important evidence.

D

On November 23, 2020, Dr. Dang filed suit against FPR, alleging legal negligence.  On January 11, 2021, FPR filed an answer, including affirmative defenses and a counterclaim for unpaid legal fees.  Dr. Dang deposed Ringer on April 14, 2021.  On May 4, 2021, FPR filed a motion for summary judgment.  Dr. Dang sought a continuance of that motion under CR 56(f) so that he could

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

complete the deposition of Ringer's former associate. Dr. Dang filed a motion for partial summary judgment on May 10, 2021, asking the trial court to determine that Dr. Dang may recover emotional distress damages in his legal negligence case and to reject several of FPR's affirmative defenses.

The trial court denied Dr. Dang's request for a CR 56(f) continuance and granted FPR's motion for summary judgment. The trial court declined to address Dr. Dang's motion for partial summary judgment as moot. FPR voluntarily dismissed its counterclaim for unpaid fees.

Dr. Dang appeals.

II

A

A party seeking summary judgment bears the initial burden to show the absence of a genuine issue of material fact. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). This burden may be met by showing an absence of evidence to support the nonmoving party's burden of proof at trial. Id. at 225 n.1. Then, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. Id. at 225. We review an order granting summary judgment de novo. Id. at 226. We view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Id.

To establish a legal negligence claim, a plaintiff must prove (1) the existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client, (2) an act or omission by the attorney in breach of the duty of care, (3) damage to the client, and (4) proximate causation between the

12

No. 83002-3-I/13

attorney's breach of the duty and the damage incurred. <u>Hizey v. Carpenter</u>, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992).

B

Dr. Dang's assertions of negligence concern Ringer's exercise of professional judgment about the manner in which to handle the defense to the DOH's charges. As a result, Dr. Dang's assertions of negligence must be analyzed under Washington's attorney judgment rule. Dr. Dang argues that the attorney judgment rule is an affirmative defense, and that because FPR did not state it in its answer, FPR therefore waived it.

In the context of a legal negligence claim, the attorney judgment rule is not an affirmative defense which a defendant must plead. Rather, the attorney judgment rule is an aspect of the attorney standard of care. As explained in <u>Clark County Fire District No. 5 v. Bullivant Houser Bailey PC</u>, in matters of professional judgment, a plaintiff may establish legal negligence by showing that "no reasonable Washington attorney would have made the same decision as the defendant attorney"—in other words, by showing that the decision itself violated the standard of care because it was not within the range of reasonable alternatives from the perspective of a reasonable, careful, and prudent attorney in Washington. 180 Wn. App. 689, 706, 324 P.3d 743 (2014). Alternatively, the plaintiff may establish legal negligence by showing that the decision was arrived at in a manner that violated the standard of care, such as because it was an uninformed decision. <u>Id.</u> The attorney judgment rule does not protect a decision that is not within the standard of care for a particular situation, that was arrived at through means

13

violating the standard of care, or that was not made in good faith. See Cook, Flanagan & Berst v. Clausing, 73 Wn.2d 393, 396, 438 P.2d 865 (1968) (generally approving a jury instruction stating an attorney is not liable for malpractice where the method employed to solve a legal problem is one recognized and approved by reasonably skilled attorneys practicing in the community as a proper method in the particular case); Clark County Fire Dist., 180 Wn. App. at 704-05 (attorney not liable for making an allegedly erroneous decision involving honest, good faith judgment if (1) that decision was within the range of reasonable alternatives from the perspective of a reasonable, careful, and prudent attorney in Washington, and (2) in making that judgment decision the attorney exercised reasonable care).

In general, an error in professional judgment or in trial tactics, without more, does not subject an attorney to liability for legal negligence merely because the professional judgment or tactic led to a disadvantageous outcome. Halvorsen v. Ferguson, 46 Wn. App. 708, 717, 735 P.2d 675 (1986). The attorney judgment rule is dependent on the attorney arriving at a professional judgment or trial tactic while exercising the standard of care consisting of "the degree of care, skill, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in this jurisdiction." Hizey, 119 Wn.2d at 261. The attorney judgment rule reflects that a range of strategic approaches may be reasonable and within the standard of care in a given representation, notwithstanding that a reasonable strategy based on an appropriate evaluation may not lead to the desired outcome.

14

This principle is not an affirmative defense that must be pleaded in a defendant's answer under CR 8, but rather reflects the definition of the standard of care. By definition, when a professional judgment or a trial tactic falls into the attorney judgment rule because it was a reasonable decision, appropriately arrived at, within the standard of care, and made in good faith, it does not amount to negligence. In Halvorsen, the plaintiff asserted legal negligence based on an attorney's handling of the apportionment of the value of two businesses owned by divorcing spouses. 46 Wn. App. at 710-11. The issue of apportionment was then "an uncertain and unsettled legal area" in Washington law, and the record showed that the attorney in his trial brief both appropriately presented the available Washington authorities and made the available arguments based on "informed judgment." Id. at 718-19. This court concluded that the plaintiff's evidence failed to show a breach of the standard of care, where the plaintiff's experts testified only that they would have handled the issue differently, but conspicuously not that the attorney's handling of the issue was a breach of the standard of care. See id. at 718. Halvorsen applied the attorney judgment rule by analyzing the adequacy of the plaintiff's evidence to show a breach of the standard of care, not by requiring the attorney defendant to meet an affirmative burden of proof.

We are not persuaded that this court previously held that the attorney judgment rule is an affirmative defense, as opposed to a component of the standard of care, despite language suggesting otherwise in Clark County Fire District, 180 Wn. App. at 707, and in Spencer v. Badgley Mullins Turner PLLC, 6 Wn. App. 2d 762, 796, 432 P.3d 821 (2018).

15

No. 83002-3-I/16

Although Spencer described the attorney judgment rule as an affirmative defense to a legal negligence claim, it said so while evaluating a breach of fiduciary duty claim based on alleged violations of the Rules of Professional Conduct (RPCs). 6 Wn. App. 2d at 793-96. That context matters. In Spencer, the jury concluded that an attorney committed legal negligence by failing to submit available evidence, within an extremely short time frame, that the plaintiffs would have been able to buy out co-owners of investment real estate, so as to avoid sale to a third party. Id. at 770, 772, 776. But the trial court concluded the attorney did not violate the RPCs and did not breach any fiduciary duty. Id. at 800-01. In context, this court's comment about the attorney judgment rule concerned whether an attorney's good faith exercise of judgment may be asserted as a defense to a claim that the attorney has violated the RPCs. Id. at 796. Thus, the court was not directly commenting on the elements of legal negligence, but rather identifying the issue raised by the parties of whether good faith, in some circumstances, may be a defense to certain alleged RPC violations. Additionally, the court in Spencer ultimately did not reach whether the attorney judgment rule would provide a defense to alleged RPC violations, because the court upheld the trial court's rulings that the attorney did not violate the RPCs. Id. at 796.

Similarly, in Clark County Fire, despite the court's reference to the attorney judgment rule as an affirmative defense, like earlier Washington cases, it analyzed the rule in the context of evaluating the sufficiency of the plaintiff's evidence. 180 Wn. App. at 701, 705. The court held that the plaintiff's expert testimony that the defendant attorney's decisions breached the standard of care supported the

16

No. 83002-3-I/17

inference that the decisions were not within the range of reasonable alternatives from the perspective of a reasonable, careful and prudent attorney in Washington. 180 Wn. App. at 702, 709, 711. Despite referring to the attorney judgment rule as being an affirmative defense, neither Spencer nor Clark County Fire applied the rule as a defense depending on a defendant making an affirmative showing.

Accordingly, we hold that the attorney judgment rule is not an affirmative defense that a defendant must plead in an answer under CR 8.

C

To show proximate cause in a legal negligence claim arising out of a litigation matter, the client must show that the client would have fared better "but for" the asserted mishandling of the representation by the attorney. Daugert v. Pappas, 104 Wn.2d 254, 257, 704 P.2d 600 (1985). Washington courts have often remarked that the general principles of causation are usually no different in a legal negligence action than in an ordinary negligence case. Ward v. Arnold, 52 Wn.2d 581, 584, 328 P.2d 164 (1958); Sherry v. Diercks, 29 Wn. App. 433, 437, 628 P.2d 1336 (1981); Boguch v. Landover Corp., 153 Wn. App. 595, 611, 224 P.3d 795 (2009). This is true insofar as the plaintiff must show that the plaintiff would have achieved a better result had the attorney performed the representation without negligence. Daugert, 104 Wn.2d at 257; VersusLaw, Inc. v. Stoel Rives, LLP, 127 Wn. App. 309, 328, 111 P.3d 866 (2005). But the manner in which the plaintiff must go about showing that a better result would have been achieved but for an attorney's negligent handling of a litigation matter involves "unique characteristics"

17

No. 83002-3-I/18

compared to other types of tort cases. Brust v. Newton, 70 Wn. App. 286, 290, 852 P.2d 1092 (1993).

1

At issue is the cause in fact component of proximate cause. See Ang v. Martin, 154 Wn.2d 477, 482, 114 P.3d 637 (2005). Determining cause in fact in a legal negligence case arising out of a litigation matter requires a "trial within a trial." Id. The plaintiff re-presents the underlying matter to a trier of fact, this time presenting the matter free of the deficiencies of the original presentation alleged to be negligent. Daugert, 104 Wn.2d at 257; Aubin v. Barton, 123 Wn. App. 592, 608-09, 98 P.3d 126 (2004). The trier of fact assessing the matter without the original asserted deficiencies may then "replicate" the judgment that would have been obtained without negligence. Brust, 70 Wn. App. at 293. The difference in the trier of fact's conclusion in the legal negligence case, if any, shows "what a reasonable jury or fact finder in the initial cause of action would have done," and therefore shows any disparity in outcome that is the "but for" consequence of the original lawyer's allegedly deficient performance. See Shepard Ambulance, Inc. v. Helsell, Fetterman, Martin, Todd & Hokanson, 95 Wn. App. 231, 235-36, 244-45, 974 P.2d 1275 (1999).

Proximate cause is generally determined by the trier of fact, but the court can determine proximate cause as a matter of law if reasonable minds can reach only one conclusion. Smith v. Preston Gates Ellis, LLP, 135 Wn. App. 859, 864, 147 P.3d 600 (2006). To avoid summary judgment, "the plaintiff must produce

18

evidence that the error in judgment did in fact affect the outcome." Clark County

Fire Dist., 180 Wn. App. at 707.

Dr. Dang did not present expert testimony specifically on cause in fact, but this is not dispositive. The nature of the cause in fact inquiry in legal negligence cases arising out of litigation matters demonstrates that a plaintiff is not necessarily required to come forward with expert testimony specifically establishing that but for the attorney's alleged negligence the plaintiff would have fared better. The focus of the re-presentation of the case is not on what a particular trier of fact would have done, but rather on what a reasonable trier of fact would have done, i.e., what the result would have been without negligence. Brust, 70 Wn. App. at 293. Therefore, when cause in fact is to be established by a trier of fact's assessment of the re-presented case, a plaintiff is not necessarily required to present expert testimony on causation, because the trier of fact will assess the merits of the matter as re-presented in the legal negligence case. Slack v. Luke, 192 Wn. App. 909, 918, 370 P.3d 49 (2016).

Purported expert testimony to the effect that a trier of fact would have responded more favorably in the original matter may be subject to exclusion as inherently speculative. See Halvorsen, 46 Wn. App. at 721-22. Some decisions of this court have at times pointed to a lack of expert testimony on cause in fact as supportive of summary judgment for lack of proof in legal negligence cases. Estep v. Hamilton, 148 Wn. App. 246, 257, 201 P.3d 331 (2008) ("Estep provides no evidence she would have prevailed. Her expert . . . did not opine on the subject."); Geer v. Tonnon, 137 Wn. App. 838, 851, 155 P.3d 163 (2007) ("Geer failed to

provide expert testimony or other evidence to demonstrate that such a breach of Tonnon's duty of care was the cause in fact of Geer's claimed damages."). Expert opinion may be relevant to demonstrate the evidence that should have been presented in the original proceeding. Aubin, 123 Wn. App. at 609-10. The key, however, is that the evidence in the legal negligence matter must be sufficient to allow the trier of fact to reach a conclusion that is more favorable than the one that was reached based on the original presentation. This evidence may take the form of additional evidence that was not in the original presentation. As a result, expert testimony on causation is not necessarily required to show cause in fact in a legal negligence matter.

Dr. Dang argues that for purposes of summary judgment he needed to establish only that his position would have been materially strengthened but for Ringer's alleged negligence. But Dr. Dang's burden of proof on cause in fact was to show that with the representation he asserts was called for, a trier of fact could reasonably reach a better outcome. Daugert, 104 Wn.2d at 257; Versuslaw, 127 Wn. App. at 328; cf. 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 107.07, at 654 (7th ed. 2019). Properly framed, the issue for the trial court on summary judgment was whether, with the original MQAC record strengthened by the evidence which was allegedly negligently omitted and by the foreknowledge from depositions Dr. Dang says was lacking, a reasonable trier of fact in the legal negligence case could reach a conclusion that was more favorable than the conclusion the MQAC panel reached. Cf. Spencer, 6 Wn. App. 2d at 779. Upon such a showing, the question of cause in fact on Dr. Dang's legal negligence

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

claim would be one for the trier of fact to resolve through a trial within a trial, and summary judgment would be properly denied.

This inquiry can be made without expert testimony, by comparing the reasonable inferences that a trier of fact in the legal negligence case may make from the original MQAC record as supplemented with the evidence Dr. Dang asserts was lacking, with the conclusions the MQAC panel in fact reached. Speculation about what the original MQAC panel would have done is not relevant. Brust, 70 Wn. App. at 293. We do not need to assess the precise boundaries of expert opinion evidence potentially relevant to cause in fact in legal negligence cases, and we do not hold as a general matter that such evidence is necessarily improper. But Dr. Dang's claim does not fail merely because his standard of care expert appropriately declined to speculate about what the original MQAC panel would have decided if it had had the record Dr. Dang claims should have been presented. Rather, we assess in the light most favorable to Dr. Dang how a trier of fact might reasonably view the MQAC record as he says it should have been developed.

## 2

For patient A, MQAC stated that there was insufficient evidence to find that Dr. Dang violated the standard of care or violated EMTALA. Dr. Dang could not have received a more favorable outcome on these MQAC findings. It is significant that, for patient A, MQAC accepted that Dr. Dang did not have an obligation to provide treatment or accept a transfer because Dr. Dang was not on call at St. Clare, where patient A first presented. As discussed below, when MQAC found

violations for patient B and patient C, it did so based on actions by Dr. Dang that were independent of the fact those patients first presented at hospitals other than St. Joseph where Dr. Dang was on call. This further demonstrates why additional evidence concerning Dr. Dang's basis for disputing call responsibilities towards patients originating at Franciscan hospitals other than St. Joseph does not support a trier of fact in the legal negligence case in reaching a more favorable conclusion on the MQAC charges.

For patient B, MQAC stated that there was insufficient evidence to find that Dr. Dang violated EMTALA. However, it found that Dr. Dang's refusal to consult with the St. Francis ED physician concerning patient B's care lowered the standing of the profession in the eyes of the public in violation of RCW 18.130.180, and his refusal to consult with the ED physician, who acted in good faith on behalf of patient B, created an unreasonable risk of harm to patient B.

The omitted evidence forming the basis for Dr. Dang's legal negligence claim would have had no effect on these findings. Dr. Dang's rationale for declining to consult with the ED physician about patient B based on call disputes between Group Health and Franciscan, whether appropriate or not, does not change the fact that Dr. Dang, in fact, declined to consult. Based on the MQAC findings, this put patient B, who experienced difficulties swallowing and breathing, at an unreasonable risk of harm and delayed treatment. Both findings by MQAC make clear that Dr. Dang's violations concerned the relationships between the patients and public with the medical profession, not the relationships between providers and provider institutions. Dr. Dang presents no evidence about possible testimony

22

by Dr. Haftel or Dr. Moore, and there is no inference from the omitted e-mails, that would support a trier of fact in the legal negligence case in reaching a different conclusion than the MQAC panel reached.

For patient C, the MQAC panel found that Dr. Dang violated EMTALA when he failed to treat patient C, while he was on call for St. Joseph. The amended MQAC order expressly states, "[F]ailure to utilize a Patient Placement Center does not relieve a practitioner from his/her obligations under [EMTALA]." Even if the transfer was improper or the call structure unsatisfactory, the MQAC panel found that Dr. Dang was nonetheless obligated to treat patient C once he was transferred to St. Joseph.

Dr. Dang and Kenneth Kagan, Dr. Dang's standard of care expert, take issue with Ringer's failure to depose Dr. Moore, failure to depose Dr. Haftel or list him as a witness, and failure to introduce Dr. Dang's e-mails with Dr. Moore and others concerning the ongoing community call issue. All of this evidence concerns the community call issue the Group Health ENT specialists faced. Dr. Dang called one of his Group Health ENT specialist colleagues, Alex Moreano, MD, who testified extensively on the community call issue. Dr. Moreano and his colleagues believed that they were not obligated to care for patients seen outside of St. Joseph based on the bylaws. Dr. Moreano described the "pushback" he and his colleagues received from the Franciscan ED physicians, who believed the Group Health ENT specialists could be committing an EMTALA violation by refusing to take calls from the other Franciscan-affiliated hospitals. Group Health and the Franciscan administrations sought to address the issue, but ultimately Group

23

Health informed Dr. Dang and Dr. Moreano that they must comply with Franciscan's request to manage patients from their entire system.

Even based on an MQAC hearing record supplemented with the e-mails and the depositions of Dr. Moore and Dr. Haftel, Dr. Dang does not demonstrate that the evidence would support a trier of fact in the legal negligence case in reaching a more favorable conclusion with regard to the specific circumstances of the violations found as to patient C. Although Kagan saw the disputes between Franciscan and the Group Health ENT specialists as critical to the case, the record is clear that MQAC did not. Whether patient C was properly or justifiably transferred to St. Joseph under the applicable procedures was irrelevant, and MQAC expressly found that Dr. Dang was obligated to treat patient C at St. Joseph. Moreover, the evidence Dr. Dang asserts was negligently omitted concerning the community call dispute would not have had any bearing on Dr. Dang's assertion at the hearing that he did not see patient C because he was under the influence of medication, nor the MQAC panel's rejection of that assertion. Because it was undisputed that Dr. Dang was on call at St. Joseph and refused to treat or consult patient C after transfer to St. Joseph, while patient C was facing a potentially life-threatening condition, additional evidence that there had been a dispute about call requirements would not support a trier of fact in the legal negligence case in arriving at a more favorable outcome for Dr. Dang.

24

No. 83002-3-I/25

In reaching this holding, we do not rely on finding that EMTALA imposes a standard of care or directly applies to Dr. Dang.[2] Courts have broadly recognized that EMTALA was not enacted to establish a federal medical negligence cause of action nor to establish a national standard of care. Bryant v. Adventist Health Sys./W., 289 F.3d 1162, 1166 (9th Cir. 2002); Nartey v. Franciscan Health Hosp., 2 F.4th 1020, 1025 (7th Cir. 2021) (joining seven other circuit courts that concluded EMTALA cannot be used to challenge the quality of medical care), cert. denied, 142 S. Ct. 2770 (2022). Instead, we rely on the Washington statutory provisions that govern the standard of care and unprofessional conduct of health professionals under RCW 18.130.180. The statute contemplates that a physician may violate a statute independently of whether the physician has violated the standard of care towards a patient. See RCW 18.130.180(4), (7). Regardless, we do not review in this appeal the propriety of the findings that MQAC made. Rather, we review whether Dr. Dang's evidence, as supplemented by the omitted e-mails concerning community call, would support a trier of fact in the legal negligence case in reaching a more favorable conclusion. We do not need to determine whether MQAC was correct in concluding Dr. Dang violated EMTALA when he failed to treat patient C, because the community call e-mails do not support a conclusion other than that he failed to treat the patient. Because the omitted

---

[2] The additional authority which Dr. Dang referenced at oral argument nevertheless leaves open the possibility that EMTALA may apply directly to "an on-call physician who 'fails or refuses to appear within a reasonable period of time.'" Martindale v. Indiana Univ. Health Bloomington, Inc., 39 F.4th 416, 423 (7th Cir. 2022) (quoting 42 U.S.C. § 1395dd(d)(1)(C)).

25

community call e-mails would not alter MQAC's factual findings, they likewise would not alter the panel's conclusion about the significance of those findings.

We conclude that, considered in the light most favorable to Dr. Dang, the omitted depositions and e-mails, together with the reasonable inferences therefrom, would not support a trier of fact in the legal negligence case in reaching a conclusion more favorable to Dr. Dang on the MQAC charges. Nor does Dr. Dang make any argument or offer any evidentiary basis for concluding that any of the omitted evidence would support a trier of fact in imposing lesser discipline than was imposed. Dr. Dang fails to present a material issue of fact on cause in fact, and his claim necessarily fails.

III

Finally, we conclude the trial court did not err by denying Dr. Dang's request to continue the summary judgment hearing under CR 56(f). Erica Roberts was a former associate at Floyd, Pflueger & Ringer who assisted Ringer with Dr. Dang's case. Dr. Dang contends the trial court "condoned the defense gamesmanship" of delaying Roberts's deposition when the court proceeded with the summary judgment hearing. Dr. Dang argues that he was unable to depose Roberts and her work constituted the majority of services on Dr. Dang's case before the MQAC hearing. Kagan took issue with some of those services that he deemed critical to the issue of whether Ringer's judgments were informed. FPR responded by arguing that Dr. Dang waited to seek Roberts's deposition until seven weeks before both parties filed their motions for summary judgment and Roberts's

26

testimony would not create a genuine fact dispute regarding breach and concerning causation.

A trial court may continue a summary judgment hearing if the nonmoving party shows a need for additional time to obtain additional affidavits, take depositions, or conduct discovery. CR 56(f). When the party opposing a summary judgment motion shows reasons why the party cannot present facts justifying its opposition, the trial court has a duty to give that party a reasonable opportunity to complete the record before ruling on the case. Mannington Carpets, Inc. v. Hazelrigg, 94 Wn. App. 899, 902-03, 973 P.2d 1103 (1999). However, the trial court may deny a motion to continue when (1) the requesting party does not have a good reason for the delay in obtaining the evidence, (2) the requesting party does not indicate what evidence would be established by further discovery, or (3) the new evidence would not raise a genuine issue of material fact. Tellevik v. 31641 W. Rutherford St., 120 Wn.2d 68, 90, 838 P.2d 111, 845 P.2d 1325 (1992).

A trial court's decision on a request to continue a summary judgment hearing under CR 56(f) is reviewed for abuse of discretion. Bldg. Indus. Ass'n of Wash. v. McCarthy, 152 Wn. App. 720, 743, 218 P.3d 196 (2009). A trial court abuses its discretion if it bases its decision on untenable or unreasonable grounds. Id.

At the summary judgment hearing, the trial court rejected Dr. Dang's argument that Roberts may have had information to contradict Ringer's testimony that Ringer made the decisions at issue. Further, the trial court deemed any argument to the contrary as merely speculative.

27

Dr. Dang claims that had he been allowed to depose Roberts, he would have expected to further investigate the decision-making process used by Ringer when she decided to omit Dr. Haftel and the community call e-mails from Dr. Dang's witness and exhibit list. Ringer testified that she and Roberts discussed what to include, Roberts made the preliminary selections, and Ringer finalized the list and approved it.

Even if we were to find that Dr. Dang had a good reason for any delay in obtaining Roberts's deposition, the evidence Dr. Dang sought was at most speculative, and its discovery would not raise a genuine issue of material fact. Dr. Dang cannot point specifically to what about Ringer's decision-making process he would learn from Roberts's deposition. Further, Dr. Dang cannot point to any additional evidence relevant to proximate cause that would be learned at Roberts's deposition. Dr. Dang does not show how testimony by Roberts would support inferences justifying a more favorable outcome on the MQAC charges. Although the community call issue became the main thrust of Dr. Dang's defense at the hearing, MQAC did not give that argument the weight that Dr. Dang attributes to it. MQAC did not reference the community call issue in the conclusions of law section of its decision as to both EMTALA and RCW 18.130.180 violations. Roberts's deposition would not give rise to a genuine issue of material fact supporting cause in fact, and the trial court did not abuse its discretion when it denied Dr. Dang's CR 56(f) motion.

Because Dr. Dang's claim fails due to lack of evidence of cause in fact, the emotional distress damages issue is moot, and we need not address it.

Affirmed.

_Birk, J._

WE CONCUR:

_Chung, J._